No. 120,119

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MATTHEW ALLEN OLSMAN,
*Appellant*.

SYLLABUS BY THE COURT

1.

When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.

2.

To constitute kidnapping where a taking or confinement is alleged to have been done to facilitate the commission of another crime, the resulting movement or confinement (a) must not be slight, inconsequential and merely incidental to the other crime; (b) must not be of the kind inherent in the nature of the other crime; and (c) must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection.

3.

A kidnapping conviction based on evidence of confinement that is inherent in the crime being facilitated or which lacks significance independent of the other crime in that

1

it makes the other crime substantially easier of commission or substantially lessens the risk of detection is insufficient as a matter of law.

4.

Appellate courts use a multistep analysis when reviewing a district court's decision to exclude evidence. First, the court must determine whether the evidence is relevant, that is, whether it is both probative and material. The district court's conclusion of whether evidence is probative is reviewed for an abuse of discretion while the determination of materiality is reviewed de novo.

5.

The proponent of a particular kind of evidence, whether it be a physical object or the testimony of a witness, is required to lay a foundation before it may be admitted into evidence. A district court's ruling on whether the proponent has established sufficient foundation for the admission of evidence is reviewed for abuse of discretion. A judicial action constitutes an abuse of discretion if it is arbitrary, fanciful, or unreasonable; is based on an error of law; or is based on an error of fact. The party asserting an abuse of discretion has the burden of showing such abuse of discretion.

6.

When a trait of a person's character at a specified time is material, evidence of the person's reputation in the community in which the person lives or in a group with which the person habitually associates is admissible to prove the truth of the person's reputation.

7.

To prove the foundation for reputation evidence, the proponent must establish that the impeaching witness (1) is a member of the same community of the witness to be impeached and has been a resident thereof for a substantial period of time, (2) is aware of the general reputation of the person in question for the specific character trait, and (3)

knows the person has a reputation for dishonesty (or some other relevant trait) in the community.

8.

Appellate courts employ a two-step process to evaluate claims of prosecutorial error. First, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. Second, if error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial.

9.

Prosecutorial error is harmless if the State can demonstrate beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., there is no reasonable possibility the error contributed to the verdict. The statutory harmlessness test also applies to prosecutorial error, but when analyzing both constitutional and nonconstitutional error, an appellate court need only address the higher standard of constitutional error.

10.

Prosecutors have wide latitude in crafting their closing arguments to discuss the evidence and reasonable inferences fairly derivable from the evidence. When a case develops that turns on which of two conflicting stories is true, it may be reasonable to argue, based on evidence, that certain testimony is not believable. However, the ultimate conclusion as to any witness' veracity rests solely with the jury.

11.

Comments made by the prosecutor to inflame the passions and prejudices of the jury are erroneous. Comments appealing to sympathy for the victim are also erroneous because they inappropriately divert the jury's attention from its task as the finder-of-fact.

12.

We presume a jury follows all instructions given by the district court.

13.

The test for cumulative error is whether the totality of the circumstances establish the defendant was substantially prejudiced by cumulative errors and was denied a fair trial. In assessing the cumulative effect of errors during the trial, appellate courts examine the errors in the context of the entire record, considering how the district court dealt with the errors as they arose, the nature and number of errors and their interrelationship, if any, and the strength of the evidence.

Appeal from Elk District Court; DAVID A. RICKE, judge. Opinion filed September 4, 2020. Affirmed in part, reversed in part, and vacated in part.

*Kai Tate Mann*, of Kansas Appellate Defender Office, for appellant.

*Jodi Litfin*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., WARNER, J., and LAHEY, S.J.

LAHEY, S.J.:  A jury convicted Matthew Allen Olsman of one count of attempted rape and one count of kidnapping. In this appeal, he contends:  (1) There was insufficient evidence to support his conviction for kidnapping; (2) the district court erred in not allowing him to call the victim's sister as a witness to testify about the victim's reputation for dishonesty; (3) the district court erroneously instructed the jury on kidnapping; (4) the

4

State committed prosecutorial error in closing argument; (5) the district court erred in denying his motion for new trial; and (6) cumulative error. For the reasons set forth below, we affirm the attempted rape conviction but reverse the conviction for kidnapping.

FACTUAL AND PROCEDURAL BACKGROUND

In December 2015, J.P. lived in Howard, Kansas, near Olsman, whom she had briefly dated in high school many years prior. J.P.'s daughter often played with the daughter of Olsman and his wife, but there was no contact between the adults. On December 6, 2015, J.P. sent Olsman the first of many text and Facebook messages the two would exchange that day. She asked if he could jumpstart her car. Olsman agreed but requested food in exchange. After J.P. prepared a casserole, she and her two-year-old son took it over to Olsman's house. After Olsman let her in his mobile home, J.P. put the casserole in the kitchen then sat in the living room and engaged in conversation with Olsman. He told J.P. that his wife was gone for a few weeks.

After talking with Olsman for 10 or 15 minutes, J.P. told Olsman she needed to go home and started walking toward the front door. Olsman grabbed J.P.'s right forearm and said, "[L]et's bring up old times." J.P. took this to mean Olsman was referring to prior sexual encounters when they dated in high school. She told Olsman "no" and "stop." But Olsman picked J.P. up underneath her arms, "bearhugged" her, and carried her down the hallway into his bedroom. Olsman threw J.P. onto the bed and climbed on top of her. Olsman grabbed at J.P.'s shirt and started trying to kiss her. J.P. told Olsman to stop, but he did not. Olsman lifted up J.P.'s shirt and bra, exposing her breasts. He started kissing J.P.'s neck and breasts then started reaching down her pants. At that point, J.P. used her fingernails to claw Olsman's back beneath his shoulder blades, trying to get away from him. However, Olsman did not stop; according to J.P., he put his hand down her pants and put his finger inside her vagina, to which she did not consent.

5

As J.P. continued telling Olsman to stop, J.P.'s son began hitting Olsman, telling him, "Stop. Get off my mommy." J.P. eventually received a call from her son's father, and Olsman allowed her to sit up to answer the phone. He instructed her to answer the phone and say she would call him back. J.P. did so and then tried to run out of the room, but Olsman grabbed her by the waist, threw her back onto the bed, and climbed back on top of her. J.P. bit Olsman on the shoulder. He told her he wanted her to come back later that night. At first, J.P. told Olsman no, and he continued to hold her down. After she promised she would come back, Olsman let J.P. get up and leave the house with her son.

After J.P. left the residence, Olsman called her and told her not to tell anyone what happened. J.P. told Olsman to stop calling and texting her but asked if he would still come over and jumpstart her vehicle. Olsman came over, jumpstarted J.P.'s vehicle, and after doing so, took J.P.'s phone from her hand and deleted some of the text messages between the two. J.P. then drove to see her boyfriend, Michael Hamilton. On the way, she called her son's father and told him what happened. He suggested she call the police when she got to Hamilton's house. When she arrived, J.P. told Hamilton what happened, and Hamilton advised her to call the police. J.P. contacted the Elk County Sheriff's Department and spoke to the City of Howard Police Chief Jetta Osburn, who instructed J.P. to come to the sheriff's office.

J.P. met with Chief Osburn, provided a statement, had pictures taken, and agreed to submit to a sexual assault nurse's exam (SANE). Chief Osburn drove J.P. to Wichita where SANE nurse Tina Peck performed the exam. J.P. told Peck what happened, and Peck took swab samples from J.P.'s genital area, fingertips, neck, and left breast, along with fingernail scrapings and a buccal swab. Peck noticed an abrasion on J.P.'s right wrist but no injuries to her genital area. The KBI performed forensic testing of the swabs collected during the SANE exam. Olsman's DNA was present in the swabs from the right fingernail scrapings, left neck swab, and left breast swab.

6

While J.P. was at the SANE exam, Deputy Sheriff Dave Oehm and another deputy went to Olsman's house and asked if he would come to the sheriff's office to discuss J.P.'s allegations. Olsman agreed but requested a ride because he had been drinking alcohol; the other deputy gave Olsman a ride. At the sheriff's office, Olsman agreed to waive his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and speak with the deputies. Olsman initially denied anything occurred. He offered several conflicting accounts of how the scratches on his back were caused. First, he claimed they were from his wife. Then, he claimed they happened because he fell on his back onto some gravel. He told a different officer he got the scratches at work. But Olsman later told Oehm they happened when he "fell taking a piss."

Olsman was unable to explain how J.P. knew he had scratches on his back but agreed to have photographs taken of the scratches. While the photographs were being taken, Olsman said, "[I]f you see a bite mark on my arm it's from my wife." Olsman later claimed he and J.P. kissed in his home and J.P. scratched him and bit his arm while they were doing so. But Olsman denied anything occurred in his bedroom and claimed J.P. initiated things. Olsman also denied he exchanged any messages with J.P. before admitting he had contacted her on Facebook Messenger earlier that day.

The State charged Olsman with one count of aggravated kidnapping, one count of rape, and one count of interference with a law enforcement officer. The interference with a law enforcement officer charge was subsequently dismissed at the preliminary hearing.

Olsman did not testify at trial. He proffered evidence from J.P.'s sister, C.B., regarding J.P.'s reputation for dishonesty. After a proffer of the evidence outside the presence of the jury, the district court held it was inadmissible for lack of foundation.

The jury convicted Olsman of the lesser included crimes of kidnapping and attempted rape. Olsman filed a motion for new trial, which the district court denied at

7

sentencing. The district court imposed concurrent sentences of 55 months' imprisonment for both counts and lifetime postrelease supervision for the attempted rape conviction.

Olsman timely appealed his convictions and sentences. Additional facts are set forth as necessary herein.

I.      WAS THE EVIDENCE SUFFICIENT TO CONVICT OLSMAN OF KIDNAPPING?

Olsman argues the State did not present sufficient evidence to support his conviction for kidnapping. Specifically, Olsman asserts the confinement of J.P. was incidental and inherent in the attempted rape and it had no independent significance outside of being part of the attempted rape.

> "'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.' [Citation omitted.]" *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

The State charged Olsman with kidnapping J.P. in violation of K.S.A. 2015 Supp. 21-5408(a)(2), which provides: "Kidnapping is the taking or confining of any person, accomplished by force, threat or deception, with the intent . . . to facilitate flight or the commission of *any crime*." (Emphasis added.) In its complaint, the State specifically alleged Olsman kidnapped J.P. to facilitate the crime of rape. The State's charge of rape was that Olsman knowingly engaged in sexual intercourse with J.P. without her consent and while she was overcome by force or fear, a violation of K.S.A. 2015 Supp. 21-5503(a)(1)(A). Accordingly, the use of force to take or confine J.P. for purposes of kidnapping overlaps with the force or fear required to overcome the victim for purposes of rape.

8

In support of his argument, Olsman relies on *State v. Buggs*, 219 Kan. 203, 547 P.2d 720 (1976). There, the victims, a store owner and her son, "were accosted outside the [store], at the fringe of the parking lot, where they were subject to public view." 219 Kan. at 216. Buggs and his accomplice then forced the victims back inside the store. Once inside, Buggs and his accomplice demanded and took money from the victims, and Buggs raped the store owner. Our Supreme Court determined that "a kidnapping statute is not reasonably intended to cover movements and confinements which are slight and 'merely incidental' to the commission of an underlying lesser crime." 219 Kan. at 215.

> "[I]f a taking or confinement is alleged to have been done to facilitate the commission of another crime, to be kidnapping the resulting movement or confinement:
>
> > "(a) Must not be slight, inconsequential and merely incidental to the other crime;
> >
> > "(b) Must not be of the kind inherent in the nature of the other crime; and
> >
> > "(c) Must have some significance independent of the other crime in that it makes
> the other crime substantially easier of commission or substantially lessens the risk of
> detection.
>
> > "For example: A standstill robbery on the street is not a kidnapping; the forced removal of the victim to a dark alley for robbery is. The removal of a rape victim from room to room within a dwelling solely for the convenience and comfort of the rapist is not a kidnapping; the removal from a public place to a place of seclusion is. The forced direction of a store clerk to cross the store to open a cash register is not a kidnapping; locking him in a cooler to facilitate escape is. The list is not meant to be exhaustive, and may be subject to some qualification when actual cases arise; it nevertheless is illustrative of our holding." 219 Kan. at 216.

The court affirmed Buggs' kidnapping conviction, reasoning the "movement [of the victims from the parking lot into the store], slight though it was, substantially reduced the risk of detection not only of the robbery but of the rape." 219 Kan. at 216.

9

The facts here show Olsman grabbed J.P. by the arm as she and her son were walking toward the door to leave and said, "[L]et's bring up old times," referring to prior consensual sexual encounters. When J.P. said no to Olsman's sexual proposition, Olsman "bearhugged" her, picked her up off the ground, carried her to the bedroom, threw her on the bed, and climbed on top of her.

The State argues the confinement involved in those actions was not slight, inconsequential, merely incidental, or inherent in the nature of the rape. The State further argues that when J.P. told Olsman "no" to his sexual proposition, Olsman's removal of J.P. from the living room to the bedroom—which was farther from the front door—substantially reduced the risk the intended rape would be detected.

Under *Buggs*, when the confinement is "of the kind inherent in the nature of the other crime," it cannot be used to support the conviction for kidnapping. 219 Kan. at 216. Here, Olsman physically overpowered J.P. to commit the attempted rape. There is no independent or significant distinction between Olsman's use of force to carry out the attempted rape and the taking or confinement the State alleges as the basis of the kidnapping charge. The State's express theory of the case was that Olsman's confinement of J.P. was the force used to commit the attempted rape. Olsman's actions were both incidental to and inherent in the force or fear supporting the rape charge and do not independently support a kidnapping conviction under the *Buggs* analysis. See 219 Kan. at 216. Olsman committed the attempted rape by physically overpowering J.P. and continuing to physically control her movements, in spite of her efforts to resist the attack, until he ultimately allowed her to leave his residence.

The State argues that "[b]eing in the bedroom also lessened the risk of detection. The bedroom was down a hallway and far from the front door of Olsman's house. . . . If anyone had walked inside Olsman's house, they would not have been able to immediately see Olsman raping J.P." The State's argument that Olsman facilitated the rape and

10

substantially reduced the risk of detection by moving J.P. to the bedroom is not persuasive. The *Buggs* court clearly stated: "The removal of a rape victim from room to room within a dwelling solely for the convenience and comfort of the rapist is not a kidnapping; the removal from a public place to a place of seclusion is." 219 Kan. at 216. Here, unlike the facts in *Buggs*, Olsman did not move J.P. from a public place to a place of seclusion; he moved her from one room of his mobile home—the living room—to another—the bedroom. J.P. was already in a secluded place—inside Olsman's home—when he grabbed her. The evidence does not support a conclusion that the movement from one secluded room to another "substantially reduced the risk of detection . . . of the rape." 219 Kan. at 216.

In *State v. Chears*, 231 Kan. 161, 164, 643 P.3d 154 (1982), our Supreme Court affirmed Chears' kidnapping conviction based on the fact he moved the victim from the living room to a bedroom to sodomize her, "ensur[ing] that there would be but one witness," finding "the movement was sufficient to constitute kidnapping under the *Buggs* test." But *Chears* is distinguishable because removing the victim from the living room to the bedroom prevented Chears' accomplices and the victim's husband and daughter from seeing what was happening and lessened the chance they would attempt to interfere. 231 Kan. at 163-64. Here, Olsman's actions do not appear designed to ensure there would be only one witness. There is no evidence of any other person in, or expected to be in, the vicinity who might have detected a rape in the living room but not in the bedroom. The only other person in the house was J.P.'s two-year-old son who was in the bedroom when the acts occurred.

In *State v. Richmond*, 250 Kan. 375, 827 P.3d 743 (1992), the victim returned home while Richmond was burglarizing her residence. Richmond moved the victim from "near the entrance to the home to a distant bedroom" to "lessen[] detection of the crime[s]" of burglary and rape. 250 Kan. at 378. Richmond tied up his victim, which facilitated the burglary "by incapacitating her while he searched through her house and

11

. . . remove[d] any items he desired to take." 250 Kan. at 378. Richmond raped and retied his victim multiple times, searching the house for valuables in between. While the victim was tied up, Richmond placed a pillow over her face to prevent her from seeing him. He also tied her hands during the second rape. The *Richmond* court also found it significant Richmond "was concerned about the fact that the victim had seen his automobile [parked in front of her home] and also about whether any other person might be coming to the house." 250 Kan. at 378. The *Richmond* court held the "confinement of the victim facilitated the commission of the respective crimes" and the *Buggs* test had been satisfied. 250 Kan. at 378.

But unlike the facts in *Richmond*, there is no indication Olsman was concerned anyone might be coming into the house. The events took place in Olsman's own home, where he apparently lived with his wife. However, Olsman told J.P. his wife was gone and was not going to return for a few weeks. There was no evidence Olsman was concerned his wife might unexpectedly return home or anyone else might enter the house.

*Buggs*, *Chears*, and *Richmond* involved takings or confinements that substantially facilitated the commission of other crimes. Here, taking J.P. to the bedroom and confining her there did not substantially facilitate Olsman's attempt to rape her. A similar degree of restraint would have been required had Olsman attempted to rape J.P. in the living room, as she was clearly an unwilling party and wanted to leave.

Recently, in *State v. Snyder*, No. 119,452, 2020 WL 741663, at *11 (Kan. App. 2020) (unpublished opinion), *petition for rev. filed* March 4, 2020, another panel of this court overturned a kidnapping conviction under circumstances similar to this case. Snyder was convicted of kidnapping, aggravated indecent liberties with a child, and several other crimes. Snyder began fondling his victim in the bedroom, but she got up from the bed and went into the bathroom a few feet away and closed the door. Snyder followed her into the bathroom; when she tried to leave, Snyder grabbed her arm and

12

pulled her back into the bathroom where he continued to touch her inappropriately. The State alleged Snyder kidnapped his victim by confining her in the bathroom to facilitate the commission of aggravated indecent liberties with a child.

The *Snyder* panel rejected the State's argument that confining the victim in the bathroom substantially lessened the possibility of detection in the event the victim's grandmother returned to the house. 2020 WL 741663, at *10-11. The panel found: "Snyder's act of grabbing [the victim's] arm as she tried to escape the bathroom and dragging her back inside was 'slight, inconsequential, and merely incidental to' his committing aggravated indecent liberties with a child. See *Buggs*, 219 Kan. at 216." *Snyder*, 2020 WL 741663, at *11. Here, like *Snyder*, Olsman's actions were incidental and inherent to the attempted rape and did not substantially lessen the risk of detection or make it substantially easier to commit the crime.

Perhaps recognizing the "force" used to effect the rape is the same conduct used to support the kidnapping conviction, the State advances for the first time on appeal a new and previously undisclosed theory—the kidnapping actually occurred before the bearhug and move to the bedroom, when Olsman grabbed J.P. by the arm as she initially headed to the front door of the mobile home. The dissent describes this new theory of confinement as a "preceding confinement" based on "different and distinguishable facts" from those underlying the attempted rape. Slip op. at 34-35 (Warner, J., concurring and dissenting).

We agree with the dissent's well-written discussion of the importance of the jury system and the respect this court must accord it. Notwithstanding, *Buggs* informs us that a kidnapping conviction cannot be based on confinement which is inherent in the crime being facilitated. 219 Kan. at 216. Here, the complaint alleged a specific crime, rape, was the facilitated crime. Yet, the dissent suggests the kidnapping analysis should examine whether *any crime could* have been facilitated by the confinement involved here, arguing,

13

"[O]nce J.P. was confined inside the residence, Olsman could have committed any number of offenses, all of which were made substantially easier by the fact that J.P. could not leave the premises." Slip op. at 35 (Warner, J., concurring and dissenting). The State did not use the hypothetical "any crime" statutory language from K.S.A. 2015 Supp. 21-5408(a)(2) in the charging document; it alleged only the crime of rape. Consequently, our analysis is limited to whether the evidence shows the crime of rape was facilitated by some confinement independent of the force used to carry out the attempted rape.

Rape through force necessarily and inherently requires confinement of the victim to a particular place where the rape occurs. After all, if the victim were allowed to leave, there would be no rape. Here, the victim was already present in the mobile home at the time of the crime. And we note the force used in the attempted rape here was specifically described by the prosecutor in his closing argument when addressing the "force or fear" element of rape: "[S]he was picked up and forcibly moved down the hallway to his bedroom. . . . She was overcome by force." This argument describes exactly the same force which the prosecutor argued supported the "take or confine" element in kidnapping when discussing jury instructions: "The defendant picked her up and took her to the back bedroom where, you know, he—he did the events." Addressing the kidnapping charge in closing argument, the prosecutor said to the jury, "So what do we have to prove? Defendant took or confined [J.P.] by force. Again, when he used—he did the bearhug, he was taking her. He was confining her. He didn't let her go. He moved her." Upholding the kidnapping conviction requires us to allow what the dissent recognizes *Buggs* prohibits— a defendant being "convicted of two different crimes for identical conduct." Slip op. at 32 (Warner, J., concurring and dissenting).

We find it not insignificant that the State did not even mention the arm grab at any point in its closing argument. At the point in time when Olsman grabbed J.P. by the arm, he was asking her to consent to having sex. If J.P. agreed to have sex, then there would not have been a rape. The point being that requesting consent is factually inconsistent

14

with an "intent to hold" to facilitate the commission of rape. Only after she said no to his proposition could the intent to hold J.P. to facilitate a rape have been formed. And, J.P. never testified Olsman kept hold of her arm and physically prevented her from leaving after she said no to his proposition. But even if the jury determined Olsman intended all along to rape J.P., the grabbing of her arm is not an independently significant act. Rather, it marks the point at which Olsman began his use of force to physically control J.P. and carry out the intended rape. After she said no, he picked her up and moved her to the bedroom—the conduct the State argued forms the factual basis for both the rape and the kidnapping. Thus, applying the *Buggs* analysis, we find the evidence does not provide a basis to conclude there were "different and distinguishable facts" supporting the confinement element of kidnapping and the force element of the rape. As a result, we find there is not sufficient evidence to support the kidnapping conviction, reverse that conviction, and vacate the kidnapping sentence. Because we find insufficient evidence to support the kidnapping conviction, Olsman's contention the kidnapping instruction was erroneous is moot.

## II.     DID THE DISTRICT COURT PROPERLY EXCLUDE TESTIMONY?

Olsman argues the district court erred in excluding testimony from J.P.'s sister, C.B., that J.P. had a reputation for dishonesty. Outside the presence of the jury, Olsman proffered C.B.'s testimony to allow the district court to determine its admissibility. C.B. testified she believed J.P. had a reputation in the community as "a liar." C.B. stated she was aware of J.P.'s reputation because she "had people come to [her] and tell [her] that [J.P.] has lied about certain things." C.B. indicated she and J.P. lived together until J.P. was approximately 15 years old, at which time C.B. moved out of the house. C.B. and J.P. later lived together "[o]n and off." The last time C.B. lived with J.P. was more than five years prior to trial, and C.B. indicated she had "[v]ery little" contact with J.P. in the interim. C.B. clarified the basis for her opinion regarding J.P.'s veracity was based on

15

talking with some of J.P.'s friends when J.P. was approximately 18 years old. J.P. was 24 years old at the time of this incident.

The district court, relying on the reasoning in *State v. Penn*, 41 Kan. App. 2d 251, 201 P.3d 752 (2009), found Olsman did not lay a sufficient foundation to admit C.B.'s testimony. It noted C.B. had no connection in the community with J.P. during the last five years, the reputation was based on specific instances of conduct relayed by others rather than general reputation, and her recollection of community reputation for truthfulness was "not sufficiently contemporaneous with the time that this incident took place."

Olsman advances two arguments. First, he argues the district court's decision was based on an error of law, asserting *Penn* was wrongly decided. Second, he argues even if *Penn* were correctly decided, the district court erred in applying it to the facts.

*Standard of Review*

Appellate courts use a multistep analysis when reviewing a district court's decision to exclude evidence. First, the court must determine whether the evidence is relevant, that is, whether it is both probative and material. The district court's conclusion of whether evidence is probative is reviewed for an abuse of discretion; however, the district court's determination of materiality is reviewed de novo. *State v. Akins*, 298 Kan. 592, 615, 315 P.3d 868 (2014).

"If the evidence is relevant, the court next applies the statutory provisions governing admission and exclusion of evidence. 'These rules are applied either as a matter of law or in the exercise of the district court's discretion, depending on the rule in question.'" *State v. Bowen*, 299 Kan. 339, 348, 323 P.3d 853 (2014). A district court's ruling on whether the proponent of the evidence has laid sufficient foundation is reviewed for abuse of discretion. *State v. Ernesti*, 291 Kan. 54, 64-65, 239 P.3d 40

16

(2010). A judicial action constitutes an abuse of discretion if it "is arbitrary, fanciful, or unreasonable; is based on an error of law; or is based on an error of fact." *State v. Ingham*, 308 Kan. 1466, 1469, 430 P.3d 931 (2018).

Here, there is no dispute J.P.'s reputation for veracity was relevant. The issue is whether the district court abused its discretion in concluding Olsman failed to lay an appropriate foundation for C.B. to testify regarding J.P.'s reputation.

Penn *was not wrongly decided.*

K.S.A. 60-420 generally permits the introduction of extrinsic evidence "relevant upon the issues of credibility," but evidence of specific instances of conduct are inadmissible under K.S.A. 60-422(d) and K.S.A. 60-447(a). A witness' credibility (or lack of credibility) may, however, be proved by testimony in the form of opinion or evidence of reputation. See K.S.A. 60-446. "Thus, a witness's credibility may be attacked by showing the witness has character traits for dishonesty or lack of veracity, but those traits may only be proven by opinion testimony or evidence of reputation. Those traits may not be proven by specific instances of the witness's past conduct." *State v. Smallwood*, 223 Kan. 320, 326-27, 574 P.2d 1361 (1978).

C.B.'s reputation testimony was based on hearsay comments made by friends of J.P. Reputation evidence relating to character is a statutory exception to the hearsay rule.

> "If a trait of a person's character at a specified time is material, evidence of the person's reputation with reference thereto at a relevant time in the community in which the person then resided or in a group with which the person then habitually associated, to prove the truth of the matter reputed." K.S.A. 2019 Supp. 60-460(z).

17

In *Penn*—the case relied upon by the district court—a panel of our court discussed the foundational requirements for the introduction of opinion or reputation evidence relevant to credibility.

"In order for Penn to offer evidence to show [his victim]'s reputation in the community, he needed to set an adequate foundation to show that the evidence was admissible. When a trait of a person's character at a specified time is material, evidence of the person's reputation in the community in which the person lives or in a group with which the person habitually associates is admissible to prove the truth of the person's reputation. K.S.A. 60-460(z). 3 Barbara, Kansas Law and Practice, Lawyer's Guide to Evidence § 3.2, p. 77, sets forth the foundation proof that must be established in order to present reputation evidence under K.S.A. 60-446:

'1. The impeaching witness is a member of the same community of the witness to be impeached and has been a resident thereof for a substantial period of time.

'2. He is aware of the general reputation of the witness for the specific character trait.

'3. He knows that the witness has a reputation for (dishonesty) in the community.'" 41 Kan. App. 2d at 268.

Olsman essentially argues the *Penn* panel erred by grafting on foundational requirements for the admission of reputation testimony not contained in K.S.A. 60-420 and K.S.A. 60-446. He asserts "the *Penn* panel erred in requiring conformity with K.S.A. 60-460(z) or the treatise factors in laying a proper foundation." But in *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015), our Supreme Court approvingly quoted the same evidentiary treatise:

"'The proponent of a particular kind of evidence, whether it be a physical object or the testimony of a witness, is required to lay a foundation before it may be admitted

18

into evidence.' 3 Barbara, Kansas Law and Practice, Lawyers Guide to Kansas Evidence, § 1.9, p. 28 (5th ed. 2013)."

Olsman's argument is unpersuasive. "No evidentiary rule requires a foundation; rather, it is a 'loose term for preliminary questions designed to establish that evidence is admissible.' *A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637 (7th Cir. 2001) (citing Black's Law Dictionary 666 [7th ed. 1999])." *Wiles*, 302 Kan. at 74.

We find *Penn* properly relied on the treatise factors. While these factors may not be expressly enumerated in the statute, the adequacy of foundation is not subject to a formal evidentiary rule. But "[a]s a prerequisite for the testimony of a witness on a relevant or material matter, there must be evidence that he or she has personal knowledge thereof." K.S.A. 60-419. The foundational requirements adopted by *Penn* are consistent with this statutory requirement. They provide a sound basis for the trial court to determine whether the witness has sufficient personal knowledge to testify as to a person's reputation for veracity. Olsman's argument the *Penn* panel "erred in requiring conformity with K.S.A. 60-460(z)" is unfounded. Here, the reputation evidence was based on out-of-court hearsay statements by J.P.'s friends. Neither K.S.A. 60-420 nor K.S.A. 60-446 authorize the admission of hearsay evidence merely because it relates to witness credibility. Olsman has not shown *Penn* was wrongly decided. We find the district court did not err in relying on *Penn* for the foundational requirements to admit reputation evidence.

Olsman alternatively argues even if *Penn* was correctly decided, the district court erred in its application of the treatise factors to the facts of this case. He asserts there is no temporal proximity requirement under the treatise factors; therefore, the district court erred in excluding C.B.'s testimony based on the lapse in time since she last had significant contact with J.P. or her friends. The recency of the events underlying the basis

for C.B.'s opinion is not explicitly discussed in *Penn*. However, it is an appropriate and important consideration under K.S.A. 2019 Supp. 60-460(z).

The reputation hearsay exception applies when the "person's character *at a specified time* is material" and is for "evidence of the person's reputation with reference thereto *at a relevant time in the community.*" (Emphases added.) K.S.A. 2019 Supp. 60-460(z). At the time of trial, J.P. was a 24-year-old adult. The relevant time frame for J.P.'s reputation for veracity in the community was between the time she reported the incident in December 2015 and when she testified at trial in June 2017. The district court noted the reputation evidence proffered by C.B. related to J.P.'s teenage years. A person's reputation can change over time, and C.B. was going to testify to J.P.'s reputation when she was a teenager—age 18 or younger. The factual basis for C.B.'s opinion was grounded in specific instances of past conduct, which are inadmissible for purposes of proving "traits for dishonesty or lack of veracity." See *Smallwood*, 223 Kan. at 326. And, as noted by the district court, the witness was testifying about J.P.'s reputation as it existed more than five years previously. There was no evidence suggesting J.P.'s teenage reputation was reflective of her reputation in the community at the time of this event or time of trial. A district court abuses its discretion only when no reasonable person would agree with its view or its decision is based on an error of law or fact. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015). Given all the circumstances, including the lapse of five years between the events that formed the basis for J.P.'s reputation and the events leading to the trial, we do not find the district court's determination to be an abuse of discretion.

Olsman also argues the district court's finding that J.P. and C.B. did not live in the same community was based on an error of fact because "there is no evidence in the record of what community C.B. lives in." An error of fact occurs when "substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256

20

P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012). However, Olsman never asked C.B. if she lived in the same community as J.P. Olsman needed to lay appropriate foundation before the evidence could be admitted. Specifically, Olsman needed to establish C.B. was a member of the same community as J.P. before she could testify to J.P.'s reputation for honesty in the community. See *Penn*, 41 Kan. App. 2d at 268. C.B. admitted having very little if any contact with J.P. over the preceding five years.

Even though the district court may have been incorrect in affirmatively stating C.B. and J.P. *were not* of the same community, it is a distinction without a difference. Olsman needed to establish C.B. and J.P. *were* members of the same community, and he did not do so. Accordingly, we find the district court made a correct ruling. See *State v. Overman*, 301 Kan. 704, 712, 348 P.3d 516 (2015) (if district court reaches correct result, decision will be upheld even though it relied on wrong ground or assigned erroneous reasons for decision). Olsman has not shown error in the district court's application of the treatise factors recited in *Penn*.

Olsman further argues the district court's decision violated his constitutional rights to present a defense. When a criminal defendant claims a district court interfered with his or her constitutional right to present a defense, we review the issue de novo. The exclusion of evidence integral to the defendant's theory of the case can violate the defendant's right to a fair trial. However, the defendant's right to present a defense is subject to the rules of evidence and applicable caselaw. *State v. Bridges*, 297 Kan. 989, 996, 306 P.3d 244 (2013). Here, Olsman's argument is not grounded in a per se claim his constitutional rights were violated; rather, his argument is based on an alleged evidentiary ruling error. Because Olsman has not shown error in the district court's evidentiary ruling, his constitutional violation claim fails as well.

III.    DID THE STATE COMMIT PROSECUTORIAL ERROR?

Olsman contends the State committed prosecutorial error in closing argument by commenting on Olsman's and J.P.'s credibility and making statements in its rebuttal argument designed to inflame the passions of the jury. In *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016), our Supreme Court set forth the following two-step analysis for evaluating claims of prosecutorial error:

> "Appellate courts will continue to employ a two-step process to evaluate claims of prosecutorial error. These two steps can and should be simply described as error and prejudice. To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman*. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' We continue to acknowledge that the statutory harmlessness test also applies to prosecutorial error, but when 'analyzing both constitutional and nonconstitutional error, an appellate court need only address the higher standard of constitutional error.' [Citations omitted.]"

In order to determine whether an error is harmless under *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), appellate courts must

> "consider any and all alleged indicators of prejudice, as argued by the parties, and then determine whether the State has met its burden—*i.e.*, shown that there is no reasonable possibility that the error contributed to the verdict. The focus of the inquiry is on the impact of the error on the verdict. While the strength of the evidence against the

22

defendant may secondarily impact this analysis one way or the other, it must not become the primary focus of the inquiry." *Sherman*, 305 Kan. at 111.

Olsman asserts the prosecutor made impermissible statements relating to the credibility of witnesses—essentially, the prosecutor stated J.P. told the truth and Olsman lied to the officers. "A prosecutor commits error by 'commenting on witnesses' credibility—specifically, calling defendants or defense counsel liars during arguments to the jury.' Euphemistically calling a defendant a liar is treated no different. [Citations omitted.]" *State v. Williams*, 303 Kan. 585, 602, 363 P.3d 1101 (2016). However, prosecutors have wide latitude in crafting their closing arguments to discuss the evidence and reasonable inferences fairly derivable from the evidence. See *State v. Tahah*, 302 Kan. 783, 788, 358 P.3d 819 (2015). "When a case develops that turns on which of two conflicting stories is true, it may be reasonable to argue, based on evidence, that certain testimony is not believable. However, the ultimate conclusion as to any witness' veracity rests solely with the jury." *State v. Pabst*, 268 Kan. 501, 507, 996 P.2d 321 (2000).

Here, the prosecutor stated J.P. "told the story consistently. Told the truth." The prosecutor subsequently commented on inconsistencies in Olsman's statements to the deputies, stating: "Who are you going to believe in that regard folks? The person that lied to the officer, if you feel that it's a lie, 10 times before he got to even a semblance of the truth?" Based on our Supreme Court precedent, both of these statements are impermissible comments on credibility. In particular, referring to the defendant as a "liar" in the manner done here is not permissible argument. See *Williams*, 303 Kan. at 602; *Pabst*, 268 Kan. at 507.

In determining the prejudicial effect of the statements, we first observe the statements were limited and isolated in the context of the entire argument. When viewed in its entirety, the entire argument is primarily an evidence-based attempt to persuade the jury. And, in the context in which the statements were made, the prosecutor correctly

23

reminded the jury that it alone was empowered to determine what evidence and statements were true or not. See *State v. Brown*, 300 Kan. 542, 560, 331 P.3d 781 (2014) (noting prosecutor's comments considered in context made, not in isolation).

The prosecutor's statement that J.P. "[t]old the truth" was prefaced with the statement, "She's told the story consistently." This followed the prosecutor's discussion of the fact J.P.'s trial testimony was consistent with her statements to other witnesses—her boyfriend, the SANE nurse, and law enforcement officers—and J.P.'s statements were, in fact, consistent. Similarly, the prosecutor's statement that Olsman "lied to the officer" was impermissible; however, the prosecutor qualified the statement by saying "if you feel that it's a lie." While the language the prosecutor used was outside the wide latitude afforded to prosecutors in closing argument, the overall thrust of the argument was not. The prosecutor's comments were embedded in a permissible argument that J.P.'s consistent version of the events supported a reasonable inference she was being truthful. The offending statements followed an extensive discussion of the evidence in which the prosecutor pointed out numerous differing accounts of the events by Olsman. At the beginning of this discussion, the prosecutor told the jury:  "Let's start looking at the defendant's version or versions. And you are the trier of fact. You're the one that gets to determine what's true and what's a lie or what's in between." The overall nature of the prosecutor's argument was premised in reasonable inferences fairly derivable from the evidence and directed the jury to reach its own conclusion.

In our analysis, we must also consider Olsman's contention that the prosecutor's argument in rebuttal was an appeal to the jury for sympathy toward J.P. and intended to inflame the passions of the jury. Specifically, Olsman takes issue with the prosecutor's following statement:

"Likewise, in regards to comments—and victims face this in every case like this. Their reputations, their—their respectability and even if they're considered a human being, gets

24

slut—sullied. And the defendant's statements, right from the get-go—we went through some of those earlier. Did just that. She's just a booty call. I mean that—he showed what show of respect he had for her in that statement alone. You know, you know how she is. And in the trial, well, you know, how believable can they be because—because of trust issues they look at each other's phones. You know, I guess they shouldn't bother living, huh?"

Comments made by the prosecutor to inflame the passions and prejudices of the jury are erroneous. *State v. Nesbitt*, 308 Kan. 45, 56, 417 P.3d 1058 (2018). Comments appealing to sympathy for the victim are also erroneous because they inappropriately divert the jury's attention from its task as the finder-of-fact. *State v. Simmons*, 292 Kan. 406, 419, 254 P.3d 97 (2011). Here, Olsman correctly argues the prosecutor's comments were erroneous. They had nothing to do with the charged offenses and appear to be a straightforward appeal for sympathy toward J.P. The State argues the prosecutor's comments were not inappropriate as they were grounded in the evidence. The State cites to Olsman's statements to the deputies, referring to J.P. as "just a booty call," and J.P. "gets around." The State asserts the evidence supported a reasonable inference Olsman "had little respect for J.P. . . . [and] simply used J.P. for sexual encounters."

While these may be rational inferences, they have little bearing on the charged offenses. Whether Olsman held J.P. in the lowest regard or the highest esteem has no bearing on whether he kidnapped and attempted to rape her. Further, whether Olsman previously used J.P. for prior sexual encounters has no bearing on whether he forcibly confined and attempted to rape her on the date in question. The prosecutor followed up his comments with a general attack on Olsman's theory of defense, stating: "The law and justice protects all of us, supposedly. And if all you can do is attack the individual, that should tell you something about what the defense is." The prosecutor's comments in this regard are an improper appeal to the jury for sympathy toward J.P.

25

However, even considering all three of the prosecutor's erroneous statements, we find no reasonable probability these comments affected the outcome of the trial in light of the entire record. The prosecutor's first two comments were firmly grounded in the evidence. The prosecutor's comments in rebuttal argument were less defensible because the point made was not a relevant issue for the jury to consider. Even though the challenged statements overstepped the wide latitude afforded to prosecutors in closing arguments, they were not particularly egregious as the prosecutor contemporaneously reminded the jurors it was their job to determine credibility, and the arguments were framed as reasonable inferences that could be drawn based on consistencies or inconsistencies in the evidence.

Considering the entirety of the argument in light of all of the evidence, we find the State has met its burden to show the prosecutorial errors were harmless beyond a reasonable doubt. The jury was properly instructed on the State's burden of proof and was instructed to disregard any statements, arguments, or remarks by counsel not supported by the evidence. We presume the jury followed all instructions given by the district court. *State v. Rice*, 273 Kan. 870, 873, 46 P.3d 1155 (2002). During closing argument, the prosecutor reminded the jury it was charged with making credibility findings to determine the truth of the facts alleged. But for the isolated comments complained of by Olsman, the prosecutor's closing and rebuttal arguments were appropriately focused on the charged offenses and the evidence supporting the charges.

We also note there was strong evidence supporting Olsman's convictions. J.P. was consistent in her accounts of the events when she reported them, and her trial testimony was consistent with her earlier statements, as was the physical evidence. DNA evidence corroborated J.P.'s claim she scratched Olsman's back as she was trying to get him off of her, as well as her claim Olsman kissed her left breast. Olsman's DNA was found in swabs taken from J.P.'s right fingertip, left breast, and fingernail scrapings, and the scratches on Olsman's back were consistent with J.P.'s account of the events. And

26

Olsman, during his interview with the deputies, offered a number of inconsistent explanations of his interactions with J.P., including how he got the scratches on his back and the bite mark. In sum, we find the State has met its burden to show the error was harmless, i.e., there is no reasonable possibility the error contributed to the verdict. See *Sherman*, 305 Kan. at 111.

## IV. DID THE DISTRICT COURT PROPERLY DENY OLSMAN'S MOTION FOR NEW TRIAL?

Olsman argues the district court erred in denying his motion for new trial. "The court on motion of a defendant may grant a new trial to the defendant if required in the interest of justice." K.S.A. 2019 Supp. 22-3501(1). The district court's decision on a motion for new trial is reviewed for an abuse of discretion. *State v. Ashley*, 306 Kan. 642, 650, 396 P.3d 92 (2017). A judicial action constitutes an abuse of discretion if it is arbitrary, fanciful, or unreasonable; it is based on an error of law; or it is based on an error of fact. *Ingham*, 308 Kan. at 1469.

Olsman asserted two grounds in his motion for new trial. First, he alleged the district court improperly excluded C.B.'s testimony. As discussed above, we find the district court did not err in excluding C.B.'s testimony. Olsman also alleged that Deputy Oehm violated the prohibition against admission of evidence of prior crimes in K.S.A. 2019 Supp. 60-455 when he referred to Olsman having been in jail on a previous occasion.

Oehm testified that after J.P. had given her statement to police and was transported for the SANE exam, he went to Olsman's house and asked him to come to the sheriff's office for an interview. Olsman agreed but requested a ride because he had been drinking. Olsman was given a ride to the sheriff's office and spoke with deputies after waiving his *Miranda* rights. On direct examination, Oehm testified he could smell alcohol on Olsman's breath, but Olsman was not slurring his words and did nothing to make Oehm

27

think he was impaired to such a degree he could not understand what he was doing. On cross-examination, Oehm testified he had no prior contact with Olsman and did not know how he normally spoke or acted when not consuming alcohol. When asked what other factors he relied on to determine Olsman was not impaired, other than Olsman not slurring his speech, Oehm stated: "Just the fact that he remembered what the food had tasted like or smelled like when he was in jail eight years ago. We were communicating just fine."

Olsman objected, asserting Oehm purposefully injected evidence he knew was inadmissible. The district court admonished Oehm to answer questions narrowly without expansion. It further instructed the jury to "disregard the last answer given by the officer in regards to anything that the defendant had been previously involved in. It is not pertinent to any issue in this trial. So I will instruct you to disregard."

Olsman argues Oehm's statement "may have led the jury to conclude [Olsman] had general propensity to commit crimes. This, in turn, may have prompted the jury to disregard his theory [of] defense." He further argues Oehm's actions were a bad faith attempt to introduce inadmissible evidence, and the generic nature of the allegation may have led the jury to wildly speculate as to what prior crime or crimes Olsman may have committed.

Olsman acknowledges the district court's admonishment to Oehm and its curative instruction to the jury but fails to explain how the district court's admonitions were insufficient to cure any prejudicial effect of the statement. We presume the jury followed all instructions given by the district court. *Rice*, 273 Kan. at 873. Olsman does not point to anything showing the jury disregarded the district court's admonition, nor does he argue or explain how Oehm's statement was so prejudicial it could not be cured by the district court's instruction to disregard it.

28

As the party asserting an abuse of discretion, Olsman has the burden of showing such abuse of discretion. See *Ashley*, 306 Kan. at 650. Olsman does not argue the district court abused its discretion based on an error of fact or law; he merely contends the district court's decision was unreasonable. However, Olsman fails to demonstrate the district court's actions were unreasonable, and we find no abuse of discretion in the manner the district court addressed the matter.

V.      DOES CUMULATIVE ERROR WARRANT REVERSAL OF OLSMAN'S CONVICTIONS?

Olsman argues even if none of the errors he complains of are individually reversible, the cumulative effect of the errors warrants reversal of his convictions and remand for a new trial. The test for cumulative error is whether the totality of the circumstances establish the defendant was substantially prejudiced by cumulative errors and was denied a fair trial. In assessing the cumulative effect of errors during the trial, we examine the errors in the context of the entire record, "considering how the trial judge dealt with the errors as they arose . . . ; the nature and number of errors and their interrelationship, if any; and the strength of the evidence." *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014).

Given our reversal of the kidnapping conviction, there remain at most two errors that bear on the cumulative error analysis:  the prosecutor's improper statements in closing argument and the deputy's reference to Olsman having previously been in jail. While multiple harmless errors may aggregate into reversible cumulative error, here, they do not.

As discussed above, the prosecutor's statements in closing argument were erroneous, but the context in which they were made mitigates any prejudicial effect. And Oehm's statement had very little prejudicial effect in light of the district court's instruction to the jury to disregard it. There is some potential interrelationship between

29

the prosecutor's comments on witness credibility and Oehm's statement regarding Olsman having previously been in jail. But the collective effect of the errors is not meaningfully more prejudicial than the sum of its parts, and the errors do not significantly compound one another.

Oehm's statement was brief, the jury was instructed to disregard it, and no further reference was made to Olsman's criminal history. While the prosecutor suggested Olsman had not been truthful in his accounts of the incident, the statement was premised in the evidence presented and invited the jury to reach its own conclusion based on Olsman's numerous differing explanations of the incident. Likewise, the prosecutor's statement that J.P. told the truth was premised in the evidence regarding her consistent version of the events in her testimony at trial and her account of the crime when she reported it to her boyfriend, her son's father, law enforcement, and the SANE nurse. In the overall context of the argument, the prosecutor reminded the jury that its role was to determine what was true and encouraged the jury to reach that conclusion based on the evidence.

There was ample evidence to support J.P.'s account of the events, including DNA evidence taken from her right fingertip, left breast, and fingernail scrapings. J.P. was also consistent in her account of the events when she reported it to multiple other witnesses. Given the overall strength of the evidence and the limited prejudice from the two identified errors, we do not find substantial prejudice resulted from the identified errors. Olsman is not entitled to a new trial based on cumulative error.

We reverse Olsman's conviction for kidnapping and vacate his sentence on that charge but affirm his conviction for attempted rape.

Affirmed in part, reversed in part, and vacated in part.

30

\* \* \*

WARNER, J., concurring in part and dissenting in part:  I join fully in the majority opinion's analysis of Matthew Olsman's appeal of the district court's exclusion of C.B.'s testimony, as well as his claims of prosecutorial and cumulative error and his motion for a new trial. I write separately, however, because I disagree with the majority's conclusion that Olsman's confinement of J.P. within his home against her will—a confinement that the jury found facilitated Olsman's sexual advances and attempted rape—was insufficient to support the jury's kidnapping verdict.

The jury "is a central foundation of our justice system and democracy." *Pena-Rodriguez v. Colorado*, 580 U.S. __, 137 S. Ct. 855, 860, 197 L. Ed. 2d 107 (2017). We rely on jurors to observe witnesses' demeanor, to listen to their testimony, and to weigh the evidence presented in the context of each party's arguments to determine what versions of events are credible. And once jurors have been instructed on the law, we trust them to apply that law to the facts and render a verdict.

The verdict in this case shows that the jury did not take this responsibility lightly. The jury considered the witnesses' testimony and carefully weighed the evidence in light of the court's instructions. Having done so, the jurors concluded the State had not proved that Olsman committed either of the most serious crimes at issue—rape and aggravated kidnapping. They also concluded the State *had* proved the elements of attempted rape and kidnapping beyond a reasonable doubt.

Appellate judges can't ask jurors what evidence they found compelling, or why. Because appellate courts are courts of review, we are necessarily removed from the trial process. This separation provides Olsman a fresh set of eyes to review earlier rulings and findings in his case. But it also means that we must evaluate the legal and factual basis of a conviction on a written record. Reviewing a written transcript of a proceeding, along

31

with the various exhibits presented, is not the same as hearing witnesses' live testimony, observing their demeanor, and discussing those collective observations during jury deliberations.

It is for this reason that appellate courts do not reweigh evidence. *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018). We lack the context or ability to do so. Instead, when a defendant in a criminal case challenges his or her conviction by questioning the sufficiency of the evidence presented at trial, appellate courts defer to the jury's factual findings by "'reviewing *all the evidence* in a light most favorable to the prosecution.'" (Emphasis added.) 307 Kan. at 668. And we must uphold the jury's verdict as long as there was some evidence presented to support each element of the offense of conviction. See 307 Kan. at 668; *State v. Kettler*, 299 Kan. 448, 471, 325 P.3d 1075 (2014). In my view, the majority's assessment of the evidence supporting Olsman's kidnapping conviction ventures into the realm of the jury's fact-finding role, engaging in the very reweighing we repeatedly and consistently disavow.

To prove kidnapping, the State was required to show that Olsman took or confined J.P. by force with the intent to "facilitate" the rape. K.S.A. 2015 Supp. 21-5408(a)(2). To distinguish kidnapping under this section from the other crime a defendant intends to commit (here, rape), Kansas caselaw explains that the taking or confinement must "not be slight, inconsequential and merely incidental to" or "of the kind inherent in the nature of the other crime." *State v. Buggs*, 219 Kan. 203, 216, 547 P.2d 720 (1976). Instead, the taking or confinement "[m]ust have some significance independent of the other crime in that it makes the other crime substantially easier [to commit] or substantially lessens the risk of detection." 219 Kan. at 216. The *Buggs* standards, though sometimes difficult to apply, aim to ensure a defendant is not convicted of two different crimes for identical conduct. See *State v. Weber*, 297 Kan. 805, 808, 304 P.3d 1262 (2013); *State v. McKessor*, 246 Kan. 1, 10-11, 785 P.2d 1332 (1990).

32

The district court instructed the jury—consistent with Kansas statutes, the pattern jury instructions approved by the Kansas Supreme Court, and *Buggs*—that "[t]he word 'facilitate' means something more than just to make more convenient. 'To facilitate' must have some significant bearing on making the commission of the crime easier." See PIK 4th Crim. 54.210, Comment (2018 Supp.). And the jury found that Olsman's actions met that definition. Our role is to determine "whether, after review of all the evidence, viewed in the light most favorable to the prosecution," there is evidence in the record to support the jury's finding. *State v. Stafford*, 296 Kan. 25, 53, 290 P.3d 562 (2012). This means that if "the essential elements of the [kidnapping] charge are sustained by any competent evidence[,] the conviction must stand." *State v. Burton*, 235 Kan. 472, 476, 681 P.2d 646 (1984). Put another way, the "inquiry is not whether the [appellate] court *itself* believes the evidence establishes guilt beyond a reasonable doubt, but rather whether the court believes *any* rational trier of fact could have found guilt beyond a reasonable doubt." 235 Kan. at 476.

Following these guideposts, there is evidence to support the jury's finding. J.P. testified at trial that after she brought Olsman the casserole, they sat in his living room and talked for about 10 to 15 minutes, with Olsman making no sexual advances. But when J.P. got up and announced that she and her son were leaving, Olsman stopped her. He grabbed her forearm and said, "[L]et's bring up old times," referring to their previous relationship. J.P. tried to leave Olsman's home and refused his advances, saying "no" and "stop." At that point, after preventing her from leaving, Olsman carried J.P. from the living room (away from the front door) to the bedroom, forced himself on top of her, and attempted to rape her.

The majority largely focuses on Olsman's act of moving J.P. from the living room to the bedroom, finding no "independent or significant distinction between Olsman's use of force used to carry out the attempted rape and the taking or confinement" associated with the kidnapping conviction. Slip op. at 10. To reach that conclusion, the majority

33

must distinguish three decisions of the Kansas Supreme Court, each of which found sufficient evidence to support a kidnapping conviction in addition to some other sexual offense under our deferential sufficiency-of-the-evidence standard. Slip op. at 10-12. The only decision discussed where a court reversed a conviction is *State v. Snyder*, No. 119,452, 2020 WL 741663, at \*11 (Kan. App. 2020) (unpublished opinion), *petition for rev. filed* March 4, 2020—distinguishable, among other reasons, because the restraint there occurred in the midst of the sexual offense being perpetrated, not as a preceding confinement that enabled subsequent sexual violence.

At its core, the majority's reversal of Olsman's kidnapping conviction stems from my colleagues' interpretation of the circumstances surrounding Olsman carrying J.P. from the living room to his bedroom and the weight they give to the State's discussion of that movement during closing argument. See slip op. at 14-15. I question whether it is our role to second-guess what may have been the jury's assessment of that action. Accord *State v. Darrow*, 304 Kan. 710, 720, 374 P.3d 673 (2016) (appellate courts "are not afforded the luxury of deciding this case on the basis of inferences we would have found most persuasive as a factfinder"). But more importantly, when assessing the sufficiency of the evidence, our review does not turn on particular arguments or explanations offered by the parties. After all, the jury's deliberations were not so limited. See *State v. Thach*, 305 Kan. 72, 80-81, 378 P.3d 522 (2016) (emphasizing that "regardless of what the State attempted to prove," our sufficiency-of-the-evidence analysis turns on "whether the State presented evidence on which a reasonable factfinder could conclude beyond a reasonable doubt" that the crime in question was committed). Instead, appellate courts must consider "all of the facts and circumstances" before the jury. *Darrow*, 304 Kan. at 716. And the majority opinion discounts facts that support the jury's verdict.

Setting aside whether carrying J.P. to the bedroom was kidnapping or part of the (attempted) rape, Olsman forcibly prevented J.P. from leaving his home and confined her inside his residence against her will. Though this confinement may have made his

34

attempted rape of J.P. possible, it was not merely incidental or inherent to the sexual assault. Instead, the confinement and the attempted rape were different and distinguishable acts. Indeed, once J.P. was confined inside the residence, Olsman could have committed any number of offenses, all of which were made substantially easier by the fact that J.P. could not leave the premises. Accord *Sumpter v. State*, No. 117,732, 2019 WL 257974, at *5 (Kan. App.) (unpublished opinion), *rev. denied* 310 Kan. 1071 (2019) (recognizing that once a woman was trapped inside a car, and thus kidnapped, "that situation could have been the prelude to all sorts of crimes and was not unique to rape or even sex offenses"). That includes the intended rape.

The majority's reversal means that these facts, as a matter of law, cannot support a conviction for kidnapping. If confining a person in one's residence against his or her will, thus facilitating other crimes, does not meet the definition of kidnapping under K.S.A. 2015 Supp. 21-5408(a)(2), I am at a loss for what type of confinement would. And the majority's conflation of Olsman's acts of confinement supporting the kidnapping charge with his acts involved in the attempted rape troubles me. See slip op. at 14-15. I wonder if the ongoing, sexually violent nature of that offense—overpowering J.P. by force or fear—has distracted us from J.P.'s confinement, causing us to analyze this kidnapping conviction differently from kidnappings motivated by crimes like robbery.

These reflections need not be resolved here. They likely stem from *Buggs'* intentionally imprecise definition of "facilitate"—that is, a disagreement about whether the confinement was "incidental" to the intended rape or merely made that crime easier to commit. See 219 Kan. at 216. Certainly, the majority opinion and this dissent interpret Olsman's grabbing J.P.'s arm and preventing her from leaving his home differently. See slip op. at 15 (finding that "the grabbing of her arm is not an independently significant act"). But in my view, when the evidence presented could rationally support either conclusion, the ultimate assessment is one that we entrust to jurors—not one that should be reweighed and second-guessed by an appellate court on a cold record.

35

I recognize that my disagreement with my colleagues will have little practical effect on Olsman, as the prison sentences imposed for his two convictions were to run concurrently and were of equal duration. Olsman's postrelease supervision is controlled by his conviction for attempted rape, which we affirm. But that minimal practical impact does not alter our appellate role in these proceedings. It does not magnify the limited lens through which we observe the facts at trial or diminish the deference we give to a jury's factual findings when there is evidence in the record to support them.

Because Olsman's confinement of J.P. facilitated his intended and attempted rape, the jury's verdict is supported by sufficient evidence. I respectfully dissent from the majority's reversal of Olsman's kidnapping conviction.