NOT DESIGNATED FOR PUBLICATION

No. 123,742

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

RICHARD CHANTEZ BUTLER,
*Appellant*.


MEMORANDUM OPINION

Appeal from Atchison District Court; ROBERT J. BEDNAR, judge. Opinion filed August 26, 2022. Affirmed in part, reversed in part, and vacated in part.

*Carol Longenecker Schmidt*, of Kansas Appellate Defender Office, for appellant.

*Sherri L. Becker*, county attorney, and *Derek Schmidt*, attorney general, for appellee.


Before GREEN, P.J., SCHROEDER and CLINE, JJ.


PER CURIAM: Richard Chantez Butler appeals from his 15 convictions and sentence related to raping his ex-girlfriend. He argues that a charge of aggravated kidnapping was not supported by sufficient evidence. He asserts that three convictions of rape and two convictions of aggravated criminal sodomy are multiplicitous. He contends that the State committed prosecutorial error during closing argument. He argues that the trial court erred in denying his motion for a new trial. And he asserts that the trial court violated his right to a jury trial when it included prior convictions in calculating his prison sentence. For the reasons set forth below, we affirm in part, reverse in part, and vacate in part.

1

FACTS

*Butler and L.K.'s relationship*

L.K. testified at trial that she and Butler were in a relationship for roughly two years and five months, with Butler moving into her residence around Thanksgiving of 2018. Butler threatened, raped, and sodomized her in her home on May 11, 2019. L.K. testified that in the months leading up to the incident, the relationship was very dysfunctional.

L.K. supplemented her income by selling LuLaRoe products. She and Butler talked about her no longer selling LuLaRoe and instead Butler would help with household bills when he moved in. Because Butler did not have a phone or a car, L.K. gave him a cell phone, paid for his cell service, and arranged for Butler to borrow an old pickup truck from a friend. Butler started working part time at a small business owned by one of L.K.'s friends. But financial stress put a strain on the relationship.

In January 2019, Butler started working the 4:30 p.m. to 2:30 a.m. shift at a local pipe plant. Butler told L.K. that he did not want to work that shift because "things can happen if you're on that kind of shift and that is when women cheat for sure." After Butler began this job, L.K. started seeing a change in his behavior. While Butler was working the night shift at the pipe plant, he would repeatedly call L.K. demanding to know if she was alone and requiring her to show him around the house on FaceTime to prove that she was alone. L.K. testified that Butler would call 95 times a night. Butler demanded screenshots from L.K.'s phone to prove who she was talking to in between his phone calls. L.K. testified that she knew the relationship was getting to a level that was not going to work.

By March 2019, Butler was contributing to the household income, but L.K. testified that the financial strain continued. L.K. decided to downsize by selling her house to her daughter and buying her daughter's smaller house. Butler objected to this plan.

*Sudden trip to Kansas City*

On May 7, 2019, Butler told L.K., "I'm leaving for Kansas City, I need to go to a funeral, I'm taking the car, and I'm spending the night there." Butler might have called L.K. one time, which seemed odd to L.K. because they typically knew each other's whereabouts. L.K. began to suspect that Butler was cheating.

While Butler was in Kansas City, L.K.'s suspicion prompted her to look through the AT&T phone records. L.K. found a woman's phone number that Butler had been repeatedly calling and texting, up to 105 times a day. Because L.K. found evidence of what she believed was infidelity, she called a local locksmith to have the locks changed on the house. L.K. then told Butler that their relationship was over, that she changed the locks, and that he was not going to have a place to come home to. L.K. packed Butler's belongings, left them at his part-time job, and told him that the friend wanted the truck back. L.K. also demanded the cell phone back and Butler said no. L.K. called AT&T and reported the phone stolen to have service disconnected.

L.K. testified that Butler did not stay at her house in Atchison that night. L.K. believed that Butler was staying in a house on U Street. Butler did not complain about not having a place to stay, nor did he try coming back to the house uninvited.

*Cricket store confrontation*

After Butler returned from Kansas City, L.K. drove past a Cricket store and saw Butler's truck in the parking lot. L.K. assumed that Butler was trying to activate service

on the phone that she had given him. She went inside the store and took the phone from him. At trial, the Cricket store manager testified that L.K. was "irate," loud, waving her hands, and "clearly was looking for an issue." Butler remained calm and did not engage L.K., but instead he apologized repeatedly to the store employees. L.K. called the police, and Butler went outside to wait for the police. The police told L.K. that she gave him the phone to use so it was not stolen and the conflict over the phone was "a civil issue."

*Dinner at Paolucci's*

On May 10, 2019, L.K. received a text from Butler asking if they could "just go out tonight and have tacos and margaritas." One of L.K.'s friends was celebrating her husband's birthday and invited L.K. to join her and her husband at a restaurant called Paolucci's. L.K. wanted to "keep a strong level of peace" because Butler remained in Atchison and she wanted "to keep things just as calm and copacetic as I could between us so that when we would see each other in Atchison, there wouldn't be any kind of problems." Butler asked to come over to L.K.'s house to shower before dinner. L.K. allowed him to come over to shower but made clear that he was not coming back to the house to stay, and that the relationship was over. Although they agreed that the relationship was over, Butler offered to pay for L.K.'s meal and L.K. accepted.

L.K. drove Butler to Paolucci's with her. L.K. and Butler stayed at Paolucci's after L.K.'s friends left and enjoyed some drinks on the deck. L.K. testified that an employee, a bouncer named Dawaun Bailey, sat down at their table and chatted briefly with L.K. and Butler. L.K. did not know Bailey's real name, only that he goes by "D Boy." Bailey testified at trial that there was nothing unusual about L.K. and Butler's group—he observed no verbal or physical arguments.

L.K. testified that, after Bailey left, Butler leaned over and whispered, "[W]hen I find out that you're fucking him and sucking his dick, I'm going to beat that pretty little

4

face right in." L.K. testified, "And he just took me right by the nose and along my chin. It just sent chills all the way through me," further explaining that she was "[v]ery afraid. It went all the way through me." L.K. thought to herself, "I have to get out of here," so she picked up her phone and keys and said that she needed to use the bathroom. Butler said that he needed to use the bathroom also and followed her. When L.K. came out of the bathroom, Butler was at a distance with his back to her. L.K. went straight down the steps to get outside. She crossed the street, got in her car, and Butler "was right there getting in the passenger's side."

*Threats and violence in L.K.'s car*

L.K. testified that Butler was extremely angry when he got in her car. According to L.K., Butler was screaming, "[W]here the fuck do you think you're going[?] . . . [W]hat the fuck do you think you're doing[?]" When L.K. said that she was leaving, Butler grabbed her wallet/phone case, pulled the money out, and threw the phone. L.K. was in tears as she told Butler that she needed that money. L.K. testified that she did not feel comfortable looking for her phone or using it because Butler was enraged.

L.K. testified that she did not know what she was going to do, only that she was not going back to her house. L.K. told Butler that she was going to the police, and he said that he did not care because it was his money, and he was taking it. But L.K. could not pull up to the police station because of road construction. So, she drove to a nearby Sonic restaurant, parked in a handicap spot, went inside, and asked the employees to call the police. When the police arrived, L.K. told Officer Whitney Wagner that Butler had taken money from her and had threatened her at Paolucci's. Wagner told L.K. that her conflict with Butler was a civil matter and that she could not force Butler out of the house because she had not given him 30 days' notice. While the police were there, the Sonic employees called their manager, Melissa Clowers, who happened to be friends with L.K.

5

Clowers offered L.K. to stay at Clowers' place. The police let both parties leave, with L.K. driving and Butler on foot.

*The drive to L.K.'s house*

L.K. went home to grab her CPAP machine and other belongings for an overnight stay with Clowers. She called Clowers from the car on the way. While L.K. was talking and driving, Butler repeatedly called her phone. L.K. answered by adding Butler to a three-way call with Clowers. L.K. testified that Butler said, "[Y]ou went and did it. . . . [Y]ou went ahead and pulled the white bitch card and you called in the white man and that's it, I'm going to come and kill you." Clowers testified that she heard Butler say, "I'm on my way, I am going to kill you, I'm not afraid of the police, I'm going to kill you." Butler's statement scared L.K. and she urinated in her pants. L.K. hung up on the three-way call and then got back on the phone with only Clowers. Clowers told L.K. that she would call the police for L.K. Butler also left L.K. a voicemail while she was driving, which said, "[B]itch, I know you're on the phone, I ain't dumb, I'm coming to show you how I get down, though."

L.K. arrived home, grabbed her belongings, changed her clothes, and waited for the police. The officer who arrived and spoke with L.K. was Wagner, the same officer she had just seen at Sonic. L.K. told Wagner what happened and then L.K. left for Clowers' home. As L.K. was pulling out of her driveway, she saw Butler with the police officers on the right side of the driveway, next to the garage door.

L.K. testified that she was scared, but she believed that Butler could not get into the house because L.K. had changed the locks and the ADT security code. L.K. testified that she thought she turned on the ADT alarm before she left for Clowers' home. In her patrol car, Wagner followed L.K. to Clowers' home and took both their statements.

6

*The overnight hours*

L.K. testified that while she spoke with Wagner and Clowers, she received phone calls from Butler. L.K. answered some of the calls, and Butler kept asking her where she was. L.K. did not tell him. Butler told L.K. to come get him because he did not have any place to stay, but L.K. told him to stay at whatever place he had been staying at. When L.K.'s phone rang another time, Wagner answered it and told Butler, "[T]his is Officer Wagner of the Atchison Police Department, do not call this phone any more, this is harassment," and hung up. Butler called again and told Wagner, "[B]itch, I don't care . . . put her on the phone." L.K. and Clowers testified that Butler's phone calls stopped, either because L.K. blocked his number before her phone's battery died or because her battery died. Wagner left and Clowers got L.K. set up for the night.

L.K. felt sick to her stomach thinking about the events of the evening. She started thinking to herself, "I have to know where he is, I have to know what's happening." She turned her phone on and unblocked his number. L.K. spoke with Butler, who demanded to know where she was and demanded that she come and get him. L.K. would not tell him where she was and told him to stay at the house on U Street where he previously stayed. L.K. then realized that if he did walk to that house, his route could take him past Clowers' house where he would see L.K.'s car in the driveway.

Worrying that staying with Clowers could put Clowers and her young children in danger, L.K. decided to return home around 4 a.m. L.K. testified that she wanted to go home and that she felt safe because the ADT alarm had not gone off. L.K. called and then texted Butler to see if he would respond, and she was relieved when he did not. She assumed that he had calmed down and possibly fallen asleep. L.K. made the decision to go home.

7

*L.K. goes back home*

When L.K. came into the kitchen from the garage, she did not hear the ADT warning signal, which usually sounded when she entered the house. Out of the corner of her eye, she saw Butler standing on the other side of the refrigerator holding a knife. L.K. testified that Butler "threw me up against the cabinets with the knife and said, get naked." As L.K. took off her clothes, she saw the ADT box with the wires cut sitting on the kitchen counter. Noticing that L.K. saw that he had disabled the system, Butler told her, "[T]hat's right, that's right, nobody's coming for you, you're done, you're done, you unleashed the beast, you're done." L.K. admitted that, at the preliminary hearing, she did not testify that Butler made this statement. But she claimed that she recalled his statement after reviewing a summary of the sexual assault nurse examiner (SANE) report.

Once L.K. was unclothed, Butler put the knife to her back and told her to get back to the bedroom. According to L.K., when she entered the bedroom, she saw that the bed had no sheets or blankets on it. L.K. said that she needed to go to the bathroom and Butler responded, "[T]here is no bathroom, there's no bathroom, you will piss that bed, you will shit that bed, you will puke that bed, because you're in that bed for two solid days." L.K. also claimed that Butler made a series of threats, including, "I'm going to cut you into pieces in these two days and I'm going to bury part of you with your mom and part of you with your dad and part of you with your sister out at that fucking cemetery that you love so much."

L.K. testified that Butler laid out a list of rules:  that she would not see anyone all Mother's Day weekend, that if she got a call that she would say she was sick, that she would not yell out, that she would not call 911, and that she will not ask for help. Butler also told L.K. that if she tried to get the police there that he had a machine gun to take out every officer before they got there. L.K. described how Butler screamed at her and threatened to kill her daughter and her sister and make her watch.

Butler at one point demanded to know where L.K.'s keys were. After Butler went to the car to get the keys, he demanded that L.K. tell him where the spare keys were. When L.K. said that she did not know where the spare keys were, Butler choked her. L.K. testified that Butler was in a rage as he took her stuff and took her phone. L.K. testified that Butler demanded to know where she was earlier that evening. She told him that she was with Melissa Clowers. But Butler threw L.K.'s phone and said, "[Y]ou were not at Melissa's, you were fucking that fucking D Boy."

L.K. testified that she was praying and pleading, but Butler continued choking her. She testified about her vision narrowing and how she felt like she was not going to have any more air. L.K. testified that Butler was screaming, "I worked on you for so fucking long, I worked and worked and worked on you, and you went and fucked it up."

*Rape – penetration by finger*

L.K. then testified that Butler spread her legs open and "put his face right down there smelling." L.K. testified that Butler put his fingers inside her vagina, saying that he was going to "get that motherfucker's cum out of there." L.K. testified that Butler stopped, looked at his fingers, smelled, and did it again. L.K. testified that she begged Butler to stop, but he was full of rage.

*Sodomy – oral*

L.K. testified that when Butler stopped digital penetration, she laid on the bed. L.K. asked Butler, "[C]an we just lay down[?]" Butler said, "No, no, no, you're going to suck my motherfucking dick." L.K. described how Butler laid on his back and positioned her between his legs, with one hand around her throat and the other hand grabbing her by the hair. L.K. testified that she vomited, and Butler said, "Go ahead, that's what I told you, you're going to puke, you're going to shit, you're going to piss, you're going to puke

9

this bed." L.K. could not say how long this lasted but testified that Butler pulled her head up and said, "[S]top, I don't want to cum yet."

*Rape – penetration by penis*

L.K. testified that Butler told her to get in the other bedroom. Butler held the knife against L.K.'s back as they went to the second bedroom. Butler ordered L.K. to get on the bed "doggy-style," and he put his penis in her vagina without her consent. L.K. testified that during their relationship they would frequently use the spare bedroom bed for consensual sex in that position because the bedframe was shorter than the master bed. L.K. explained that this time was different because L.K. did not consent and because they were at the side of the bed, instead of the foot of the bed, so that Butler could set the knife on the bedside table. L.K. testified that Butler ejaculated, and she believed that her nightmare was finally going to be over.

*Sodomy – anal penetration with finger*

L.K. then testified that Butler said, "[Y]ou have to get yours," meaning that she needed to orgasm. Butler went to the master bedroom, carrying the knife, and returned with a vibrator. L.K. testified that Butler tried to induce an orgasm by rubbing the vibrator on her clitoris. She testified that Butler was aggravated that she was not having an orgasm, so he put his finger in her anus to make her orgasm. L.K. faked an orgasm thinking that it would make Butler stop.

*Rape – penetration by vibrator*

After L.K. faked an orgasm, Butler told her to return to the doggy-style position. L.K. testified that Butler put the vibrator in her vagina and kept pushing. L.K. testified as follows:  "I had plastic clear up to here. It was just horrible. I just kind of collapsed, like, oh, you know, making him think that, okay, wow, you know, I'm done, you know,

10

whatever, please." L.K. testified that she collapsed on the bed, trying to convince Butler that she had an orgasm, and she noted that the sun was starting to come up.

*L.K. escapes*

As the sun was coming up, L.K. and Butler lay down to go to sleep. L.K. testified that they went back to the master bedroom, with the knife on Butler's side of the bed. Butler allowed L.K. to set up her CPAP so that they could lie down for a bit. L.K. testified that she does not like to be touched while she sleeps, but Butler told her, "I'm definitely going to be holding onto you the whole time," and wrapped his arm around her neck. L.K. pretended to fall asleep.

L.K. testified that she slid out from under Butler's arm and crept to the bathroom, which was only a few steps away. While she used the bathroom, she had a direct line of sight to Butler. L.K. testified that she was able to quietly grab some clothes and dress in the bathroom. She testified that she was able to quietly open the bedroom door without waking Butler, while she watched him to see if he would wake. When she entered the kitchen, she saw that the door leading from the kitchen to the garage was open. In the garage, L.K. saw that the door to the outside was broken off its hinges, leaning on a trash can. L.K. crossed the street and knocked on a neighbor's door. The residents let her in and called 911. Atchison police went to L.K.'s house and arrested Butler. Police photographed the door to the garage off its hinges and found male underwear beside L.K.'s bed which L.K. identified as Butler's.

*The proceedings against Butler*

Based on L.K.'s allegations, the State charged Butler with 15 counts: 3 counts of rape, 2 counts of aggravated criminal sodomy, 2 counts of criminal threat, and 1 count each of aggravated kidnapping, aggravated assault, aggravated robbery, robbery, criminal

damage to property, harassment by a telecommunications device, aggravated domestic battery, and intimidation of a victim. Butler proceeded to trial on all counts. Butler's first jury trial ended in a mistrial when Officer Wagner testified that L.K.'s statement was that Butler "didn't care what happened, he was going to kill her, he didn't care if he went back to prison." The trial court found that the statement related to Butler's prior criminal history and was too prejudicial for the trial to continue.

At Butler's second jury trial, Stephanie Rissen, the sexual assault nurse examiner who examined L.K., testified about the physical examination. Rissen found no physical evidence of strangulation, including no reddening of the skin or burst blood vessels. Rissen found bruising on L.K.'s right forearm. L.K. told Rissen that it was painful to swallow, and Rissen had her see an emergency room physician for her throat and lower back pain. In addition, L.K.'s medical history included back pain from degenerative disk disease. L.K., however, testified that her back problem was "not related at all to [Butler] or any interaction with him." Rissen also found no injuries during the genital exam. And L.K. testified that she suffered no tearing or bruising to her vaginal area.

The State presented evidence of seminal fluid, detected on the vaginal swab and the anal swab of the SANE kit. A partial DNA profile was consistent with Butler's DNA.

At Butler's second trial, witnesses again referenced Butler's previous incarceration. First, defense counsel followed up on L.K.'s discovery that Butler was calling and texting another woman. The woman testified about the nature of the conversations as follows: "Basically, actually, just how he changed getting out of jail, how he was trying to do his life better, how he was a Christian. We talked about Gospel." Second, when defense counsel questioned the Cricket store manager about L.K.'s threats to have Butler arrested, the manager testified, "I remember her saying about him being maybe on parole or probation and I'm going to call the cops if you try to activate your phone."

12

After trial, Butler moved to discharge his attorney. The trial court granted his motion, allowing Butler to represent himself at sentencing.

Butler moved for a new trial based on ineffective assistance of counsel, arguing that his attorney was ineffective for failing to move for a mistrial after two witnesses mentioned his prior incarceration and for failing to adequately cross-examine L.K. At sentencing, the trial court heard Butler on his motion for a new trial. During this hearing, Butler articulated that part of his complaint related to cross-examination of Rissen, specifying that his attorney "brung the rape kit out. But she didn't speak on the full rape kit." The trial court found that Butler had not sufficiently presented a claim of ineffective assistance of counsel to merit a hearing under *State v. Van Cleave*, 239 Kan. 117, 716 P.2d 580 (1986). The trial court summarily denied Butler's motion and proceeded to sentencing. Based on a criminal history score of C, the trial court sentenced Butler to a controlling 543-month prison sentence.

Butler timely appeals.

## ANALYSIS

*Did sufficient evidence support Butler's conviction for aggravated kidnapping?*

Butler argues that any confinement of L.K. was incidental to the rape and aggravated criminal sodomy charges and, thus, the evidence did not support a separate conviction for aggravated kidnapping. The State argues that Butler refers to the wrong subsection of the kidnapping statute and that the evidence supports a conviction of the crime as charged. Our standard of review for sufficiency of the evidence is the following:

> "'When the sufficiency of the evidence is challenged in a criminal case, we review the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. An appellate

13

court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses.' [Citations omitted.]" *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021).

"This is a high burden, and only when the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt should we reverse a guilty verdict. [Citations omitted.]" *State v. Meggerson*, 312 Kan. 238, 247, 474 P.3d 761 (2020).

Butler claims that the State failed to establish the elements of aggravated kidnapping separately from the rape and sodomy charges. "Under the Due Process clause of the 14th Amendment, no person may be convicted of a crime unless every fact necessary to establish the crime with which he is charged is proven beyond a reasonable doubt." *State v. Switzer*, 244 Kan. 449, 450, 769 P.2d 645 (1989) (citing *In re Winship*, 397 U.S. 358, 368, 90 S. Ct. 1068, 25 L. Ed. 2d 368 [1970]). Butler argues that the taking or confinement of another person must be more than incidental to the underlying offense.

K.S.A. 2018 Supp. 21-5408 lays out the elements of kidnapping as follows:

"(a) Kidnapping is the taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person:
(1) For ransom, or as a shield or hostage;
(2) to facilitate flight or the commission of any crime;
(3) to inflict bodily injury or to terrorize the victim or another; or
(4) to interfere with the performance of any governmental or political function.
"(b) Aggravated kidnapping is kidnapping, as defined in subsection (a), when bodily harm is inflicted upon the person kidnapped."

Butler and the State disagree over whether we should apply *State v. Buggs*, 219 Kan. 203, 547 P.2d 720 (1976), or *State v. Burden*, 275 Kan. 934, 69 P.3d 1120 (2003).

Butler argues that, under *Buggs*, the State failed to prove aggravated kidnapping because his actions were part of the crimes of rape and did not constitute a second, separate crime. To prove that a defendant committed a taking or confinement to facilitate a crime, the State must show that a victim's movement or confinement (1) was not incidental to the underlying crime, (2) was not inherent in the nature of the underlying crime, and (3) made the defendant's underlying crime substantially easier to commit or lessened substantially the defendant's risk of detection. 219 Kan. at 216.

In *Buggs*, the female victim and her son worked at a Dairy Queen in Wichita until closing. When they left, the mother put over $300 in a bank bag and put that bag in her purse. Charles Buggs and Ronald Perry approached in the parking lot and told the workers that Perry had a gun. Buggs and Perry instructed the workers to unlock the back door and go back in the Dairy Queen. Inside, the defendants took the money and Buggs raped the mother. A jury convicted Buggs of aggravated kidnapping and rape of the mother, kidnapping of the son, and aggravated robbery. The *Buggs* court held that there was sufficient evidence for the kidnapping convictions because Buggs moved the victims from a public area to a private area, which facilitated the crimes of robbery and rape. 219 Kan. at 216.

The *Buggs* court explained the test for kidnapping as follows:

"We therefore hold that if a taking or confinement is alleged to have been done to facilitate the commission of another crime, to be kidnapping the resulting movement or confinement:
"(*a*) Must not be slight, inconsequential and merely incidental to the other crime;
"(*b*) Must not be of the kind inherent in the nature of the other crime; and
"(*c*) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection.

15

"For example: A standstill robbery on the street is not a kidnapping; the forced removal of the victim to a dark alley for robbery is. The removal of a rape victim from room to room within a dwelling solely for the convenience and comfort of the rapist is not a kidnapping; the removal from a public place to a place of seclusion is." 219 Kan. at 216.

This court elaborated on the *Buggs* court's reasoning in *State v. Olsman*, 58 Kan. App. 2d 638, 473 P.3d 937 (2020), *rev. denied* 312 Kan. 899 (2021). Matthew Allen Olsman carried J.P. down the hall into his bedroom, threw her onto the bed, and digitally penetrated her vagina. A jury convicted Olsman of attempted rape and kidnapping.

This court held that the confinement underlying the kidnapping charge was incidental to the rape. 58 Kan. App. 2d at 645. For that reason, the *Olsman* court reversed the kidnapping conviction, explaining: "Rape through force necessarily and inherently requires confinement of the victim to a particular place where the rape occurs. After all, if the victim were allowed to leave, there would be no rape." 58 Kan. App. 2d at 649. Thus, Butler argues that there was no independent or significant distinction between the force used to carry out the rapes and sodomies versus the confinement that formed the basis of the aggravated kidnapping conviction.

The State responds that the subsections of K.S.A. 2018 Supp. 21-5408 are relevant to the analysis. The State notes that Butler's argument and citation to *Buggs* reference the language of K.S.A. 2018 Supp. 21-5408(a)(2), a kidnapping with the intent "to facilitate flight or the commission of any crime." But the State points out that it charged Butler with kidnapping with the intent "to inflict bodily injury or to terrorize the victim" under K.S.A. 2018 Supp. 21-5408(a)(3). Thus, the State argues that we should not follow *Buggs* but should instead look to *Burden* as the more applicable precedent.

In that regard, Gerry A. Burden was in his residence with C.G. when he became angry with her and began hitting her. He ripped her clothes off and digitally raped her

16

and sodomized her. She broke away from him and ran to the back door. He caught up to her, put her in a choke hold, and forced her back to the bedroom. He threw her on the bed, hit her, choked her, and threatened to kill her. A jury convicted Burden of aggravated kidnapping, rape, aggravated criminal sodomy, and criminal threat. *Burden*, 275 Kan. at 934-35.

The way in which the State argues for applying *Burden* presents a clear problem. Our Supreme Court upheld Burden's conviction for aggravated kidnapping, stating that the analysis of *Buggs* did not apply. The State here argues for the same result:

> "[T]he Kansas Supreme Court clearly articulated in [*Burden*] that those additional tests should only be applied *if the State charged* kidnapping under K.S.A. 21-5408(a)(2)—to facilitate flight or the commission of any crime. *Buggs* does not apply *when the State charges* kidnapping under K.S.A. 21-5408(a)(3)—to inflict bodily injury or to terrorize the victim of another." (Emphases added.)

The problem with this reasoning is that it gives the State control over this court's analysis when it drafts the charging documents. If either K.S.A. 2018 Supp. 21-5408(a)(2) or K.S.A. 2018 Supp. 21-5408(a)(3) could apply to a defendant's actions, then the State can dictate the appellate court's analysis based on how it decides to charge a defendant. For example, if the State charges a defendant under K.S.A. 2018 Supp. 21-5408(a)(2), it runs the risk that Kansas appellate courts would apply *Buggs* and reverse the defendant's conviction. But the State could avoid that possibility simply by charging kidnapping under K.S.A. 2018 Supp. 21-5408(a)(3), and, thus, precluding any need to perform a *Buggs* analysis. This argument would then give the State the ability to dictate whether a *Buggs* or a *Burden* test should be used.

As a result, this creates a heavy, fact-intensive analysis, as demonstrated by *Burden* itself. The *Burden* court held that the evidence supported a conviction for kidnapping with specific reference to particular facts.

17

"Under the evidence herein, the jury was presented with evidence that defendant had beaten, stripped, raped, and sodomized the victim in the bathroom. *Thereafter*, the victim, naked, broke free and ran to the back door of the kitchen to escape. Before she could get through the door, she was caught by defendant, who placed her in a choke hold and forced her down the hall and into a bedroom where he beat and threatened to kill her. This is sufficient evidence that a taking occurred with intent to terrorize or commit bodily injury on the victim." (Emphasis added.) 275 Kan. at 944-45.

In laying out this chronology, the *Burden* court illustrated that Burden's convictions were based on separate acts. Burden was convicted of rape and aggravated criminal sodomy. But the aggravated kidnapping could not have been to facilitate the commission of those crimes because the rape and sodomy occurred first, and the kidnapping happened as the victim attempted escape. For example, Burden dragged her back down the hall and beat her, demonstrating that he took her with the intent to commit bodily harm. Notably, he was not convicted of a separate battery. Thwarting her escape and beating her was sufficient for a conviction under K.S.A. 21-3420(c), later codified as K.S.A. 21-5408(a)(3), for aggravated kidnapping, a taking with intent to commit bodily harm.

The State here is partially correct and does not entirely misstate the holding of *Burden*. The *Burden* court held that the *Buggs* analysis only applies to kidnappings charged under K.S.A. 21-3420(b), later codified as K.S.A. 21-5408(a)(2). But the *Burden* court's discussion operated under the assumption that the different subsections were mutually exclusive, as follows:

"The three-pronged *Buggs* test is applicable in determining whether the taking or confining was done with the intent to facilitate flight or the commission of another crime as set forth in [K.S.A. 21-3420] subsection (b) [now codified at K.S.A. 21-5408(a)(2)]. There is nothing in *Buggs* that would indicate these three restrictions were intended to apply to any taking or confining charged under any subsection other than (b). In fact, the language in *Buggs* is to the contrary. *There is no underlying crime intended to be*

18

*facilitated under (c)* [now codified at K.S.A. 21-5408(a)(3)]; the taking or confining is done with the intent to inflict bodily injury upon or to terrorize the victim or another; facilitation is irrelevant herein." (Emphasis added.) 275 Kan. at 943-44.

The reasoning here is implicit rather than explicit. The *Burden* court did not hold that the State would err if it charged kidnapping under K.S.A. 2018 Supp. 21-5408(a)(3) when (a)(2) would apply, or vice versa. But in general, it is possible for a State's complaint to be defective. See *State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016); *State v. Luebbert*, No. 118,965, 2020 WL 111290, at *5 (Kan. App. 2020) (unpublished opinion) (holding that the complaint contained a technical defect but that such error was harmless and did not require reversal). But the *Burden* court did not state that there is a "wrong" way to charge aggravated kidnapping. It simply made the obvious point that it is not possible to charge kidnapping with intent to facilitate the commission of a crime if there is no underlying separate crime. The State seeks to extend this holding to give itself the ability to choose whether to charge kidnapping under K.S.A. 2018 Supp. 21-5408(a)(2) or (a)(3) and to have that choice control the appellate court analysis.

The State gives *State v. Eckert*, No. 120,566, 2022 WL 628660 (Kan. App. 2022) (unpublished opinion), *rev. denied* 316 Kan. __ (July 8, 2022), as an example of this court determining that the *Buggs* test did not apply to an aggravated kidnapping charged under K.S.A. 2015 Supp. 21-5408(a)(3). But *Eckert* presents the State with the same problem as *Burden*:  the evidence shows that the kidnapping was separate and apart from the other crimes of conviction—there was no underlying crime that the kidnapping was intended to facilitate.

To illustrate, Justin Burke Eckert hit Amber Dial three or four times with a piece of wood that they used to prop a window open. A jury convicted Eckert of aggravated battery. Eckert held a knife against Dial, telling her to be quiet. A jury convicted Eckert of aggravated assault with a deadly weapon. When Eckert's mother knocked on the door

of the home, Eckert told Dial to be quiet or he would shoot her and his mother. A jury convicted Eckert of criminal threat.

On appeal, Eckert contested his conviction for aggravated kidnapping. In etching the facts that were separate and apart from Eckert's other crimes of convictions, this court affirmed:

> "Taking the evidence in a light most favorable to the State, the evidence established: (1) Dial got up and tried to get to the living room to escape the house, but Eckert pulled her back by her hair; (2) Dial again broke free from Eckert's grasp only to be dragged back into the bedroom by her feet; (3) when Eckert's mother showed up, Eckert threatened to kill Dial and her family if she was not quiet; and (4) Dial could not leave the house until Eckert fell asleep. Eckert does not contest that the confinement occurred with the intent to inflict bodily harm or terrorize Dial and he did in fact inflict bodily injury on Dial." 2022 WL 628660, at *5.

The *Eckert* court, like the *Burden* court, focused on the thwarted escape attempts in affirming Eckert's conviction for aggravated kidnapping. The *Eckert* court also cited different evidence to support aggravated kidnapping from the evidence supporting other charges, with some slight overlap with criminal threat. But the *Burden* and *Eckert* courts focused on reasons for taking or confinement *other than* the commission of a separate crime. In both cases, the courts found sufficient evidence of confinement which was *not* intended to facilitate the commission of a crime but was directed at another purpose.

Butler correctly notes that the State's theory at trial was that the aggravated kidnapping was intended to facilitate the rapes and sodomy crimes. This means that the State charged Butler under K.S.A. 2018 Supp. 21-5408(a)(3) but proceeded at trial as though it charged him under K.S.A. 2018 Supp. 21-5408(a)(2).

Particularly, Butler bases his argument on the State's theory of the case at trial. He assumes that if the State told the jury that he kidnapped L.K. to facilitate the rapes, then *Buggs* applies. In *Eckert*, the defendant acknowledged that *Burden* applied, but he argued that *Burden* was wrongly decided. *Eckert*, 2022 WL 628660, at *5. Conversely, Butler does not argue that *Burden* was wrongly decided. He simply asks us to apply *Buggs* as the most relevant controlling precedent, while the State argues that *Burden* is the more appropriate precedent to follow. We are duty-bound to follow our Supreme Court precedents unless there is some indication that our Supreme Court is departing from its previous position. *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). We are bound to follow both *Buggs* and *Burden*, but the question before us is which one of the differing standards or tests is the more appropriate to apply in this case.

The State argues for an uncomplicated rule. That is, if the State charges a defendant under K.S.A. 2018 Supp. 21-5408(a)(2), then this court applies a *Buggs* analysis. But if the State charges kidnapping or aggravated kidnapping under K.S.A. 2018 Supp. 21-5408(a)(3), then this court applies a *Burden* analysis. While this rule is simplistic, its easy application would allow the State to manipulate the facts of a defendant's conduct in deciding whether to charge the defendant under K.S.A. 2018 Supp. 21-5408(a)(2) or K.S.A. 2018 Supp. 21-5408(a)(3). For example, the State here seems to think that both (a)(2) and (a)(3) could apply. The State charged Butler with the crimes of rape and argued that the aggravated kidnapping facilitated the rapes, as in subsection (a)(2). But the State also described the rapes as the bodily harm committed under subsection (a)(3). The State's selective charging has left us with little recourse but to look past the complaint to Butler's conduct. In short, the only way to resolve which one of the tests should control—*Buggs* or *Burden*—is to apply each test to the facts of this case.

For instance, if the State had charged Butler under K.S.A. 2018 Supp. 21-5408(a)(2), then the conviction would fail the *Buggs* test, and we would reverse Butler's

21

conviction for aggravated kidnapping. In its brief, the State concludes its argument by laying out the facts underlying the aggravated kidnapping charge. The State describes how Butler waited for L.K. to enter the home and then ambushed her in the kitchen before moving her to the bedroom: "During the next several hours, the defendant did move L.K. from the master bedroom to a second bedroom and back to the master bedroom at knife point." But this is precisely what the *Buggs* court stated would *not* constitute a kidnapping separate from the crime of rape: "The removal of a rape victim from room to room within a dwelling solely for the convenience and comfort of the rapist is *not* a kidnapping; the removal from a public place to a place of seclusion is." (Emphasis added.) 219 Kan. at 216.

Highly informative, L.K. testified that the height of the beds differed and that, during their consensual sexual relationship, they would move to the second bedroom to make a particular position more convenient. So, Butler moved L.K. from room to room within a dwelling solely for his convenience, but he never moved her from a public place to a place of seclusion. Using *Buggs* as the test, Butler provides a textbook example of a confinement which is not separate from the rapes and is therefore not a kidnapping. His actions also echo the *Olsman* court's statement that all rapes through force inherently require confinement because if the victim were allowed to leave, then there would be no rape.

Thus, applying the *Buggs* test, Butler's conviction for aggravated kidnapping is invalid, at least based on the State's closing argument that Butler confined L.K. to commit the crimes of rape. In short, L.K.'s confinement was incidental to the crimes of rape and aggravated sodomy, confinement was inherent to the crimes, and the confinement had no significance independent of those crimes. See 219 Kan. at 216. The inescapable conclusion is that, if the State had charged Butler under K.S.A. 2018 Supp. 21-5408(a)(2), then we would have vacated his conviction for kidnapping.

But that does not end our analysis. Because we review the evidence in the light most favorable to the prosecution, we must determine whether there was sufficient evidence to support Butler's conviction of aggravated kidnapping under any theory. See *State v. Johnson*, 46 Kan. App. 2d 870, 886, 265 P.3d 585 (2011). The jury is not limited to the State's theory of the case. And jury deliberations are confidential, so there is no way of knowing under which set of facts the jury found Butler guilty. If the evidence could support a conviction under any theory, we would affirm. The only theory excluded is the one that the State presented at closing because that theory would result in Butler being convicted of two different crimes for identical conduct. See *Olsman*, 58 Kan. App. 2d at 665 (Warner, J., concurring in part and dissenting in part). In short, was there other confinement of L.K. which was not intended to facilitate the commission of rapes and aggravated criminal sodomies?

Because the jury convicted Butler of 15 individual crimes, the aggravating kidnapping charge allowed Butler to be convicted of two different crimes for the same conduct. For example, Butler waited for L.K. to enter the home and then held a knife to her throat. The jury convicted him of aggravated assault for placing L.K. in reasonable apprehension of immediate bodily harm and for holding L.K. with a deadly weapon: a knife. If we assume that this action was the kidnapping, then a double jeopardy issue arises. Butler held L.K. at knifepoint, which the jury could have found was the confining of L.K., accomplished by threat, with the intent to hold her and to terrorize her. See K.S.A. 2018 Supp. 21-5408(a)(2). But this same act underlies Butler's conviction for aggravated assault, making that conviction multiplicitous. If we rely on the evidence of Butler holding L.K. at knifepoint, then his aggravated assault conviction becomes subsumed into his aggravated kidnapping conviction.

Butler also choked L.K., and the jury convicted him of domestic battery. He was charged with aggravated domestic battery. Again, the same two issues arise. The evidence that his choking was a confinement by force could substantiate an aggravated

23

kidnapping charge because the domestic battery charge required the jury to find that Butler "knowing caused bodily harm to L.K." This same bodily harm evidence is also required to establish an aggravated kidnapping. Then, the domestic battery conviction becomes multiplicitous with the aggravated kidnapping conviction.

Butler threatened L.K., laying down ground rules for how the weekend would progress. The State charged Butler with criminal threat "with the intent to terrorize another or in reckless disregard of the risk of causing such terror, to-wit: threatened to kill L.K., contrary to K.S.A. 21-5415(a)(1)." And the jury convicted him of criminal threat. The evidence that he threatened her would be sufficient to substantiate a conviction for kidnapping.

In short, to allow evidence for another crime to count towards Butler's aggravated kidnapping would be to allow the State to improperly use Butler's same conduct to convict him of two separate crimes. Butler's actions feel intuitively like a kidnapping. But Butler argues that the State's evidence supporting those other crimes cannot also support his conviction for aggravated kidnapping. As the *Olsman* court succinctly pointed out: "The *Buggs* standards, though sometimes difficult to apply, aim to ensure a defendant is not convicted of two different crimes for identical conduct." *Olsman*, 58 Kan. App. 2d at 665 (Warner, J., concurring in part and dissenting in part) (citing *State v. Weber*, 297 Kan. 805, 808, 304 P.3d 1262 [2013]; *State v. McKessor*, 246 Kan. 1, 10-11, 785 P.2d 1332 [1990]). Thus, upholding the aggravated kidnapping conviction would require us to allow what the *Buggs* holding prohibited.

Like in *Olsman*, there were no witnesses to the crimes alleged against Butler, and thus, any confinement to the bedrooms did not lessen the threat of detection. The kitchen evidence shows that Butler confined L.K. with the intent to terrorize her, which would suffice if his conviction was for simple kidnapping. But a conviction for aggravated kidnapping requires the additional element that Butler actually inflicted bodily harm on

24

L.K. Although Rissen testified that she found some bruising on L.K.'s right forearm, this bruising likely occurred while Butler was committing the three rapes and the two aggravated criminal sodomy charges. As a result, the bruising of her arm is not an independently significant act. By contrast, the bruising marks the point at which Butler began his use of force to physically control L.K. and carry out the intended rapes and sodomies.

In short, there was no evidence that the initial confinement occurred for the purpose of inflicting some sort of bodily injury independent of the force required to commit the rapes and sodomy charges. For one thing, after Butler forced L.K. to undress at knife point in the kitchen, he required her to go the bedroom. In closing argument, the prosecutor recapped the evidence of what occurred in the two bedrooms and then told the jury the following:

> "All of this leads to the aggravated kidnapping charge. The defendant confined [L.K.] by force or threat. He did so with the intent to hold her, to inflict bodily injury on, or to terrorize her. Bodily harm was inflicted on her. He raped her over and over and over again. That is bodily harm."

Thus, in her closing argument, the prosecutor even described the confinement as part of the commission of the rapes. The conduct the State argued forms the factual basis for both the rapes and the sodomies and the aggravated kidnapping. Just as in *Olsman*, the confinement in this case has no significance beyond the rape and the sodomy charges. As a result, any taking or confinement that occurred here was incidental to the alleged rapes and sodomy charges.

Moreover, the bodily injury alleged as part of the aggravating kidnapping charge was rape. Nevertheless, Rissen found no genital injuries of L.K. during her genital exam. Furthermore, L.K. testified that she suffered no tearing or bruising to her vaginal area.

25

Because there is a lack of independent or significant evidence distinguishing between the force used to carry out the rapes and sodomy charges and the confinement that the State alleged formed the basis of the aggravating kidnapping charge, there exists insufficient evidence to support Butler's conviction for aggravating kidnapping. Thus, we vacate that conviction. Butler's sentence for aggravated kidnapping is concurrent with, and shorter than, his three convictions for rape. So, the duration of his prison sentence would not be affected. As a result, a remand for resentencing is unnecessary.

*Are Butler's three convictions of rape and two convictions of aggravated criminal sodomy multiplicitous in violation of the Double Jeopardy Clause?*

Butler claims that his three convictions of rape are multiplicitous. He also claims that his two convictions of aggravated criminal sodomy are multiplicitous. The State disagrees, saying that counts 1, 3, and 5, the rape counts, were broken up by the intervening events of counts 2 and 4, the aggravated criminal sodomy counts.

Multiplicity is the charging of a single offense in multiple counts of an information. The Double Jeopardy Clause of the United States Constitution and the Kansas Constitution Bill of Rights prohibit the State from securing multiple convictions on multiplicitous charges. *State v. Sprung*, 294 Kan. 300, 306, 277 P.3d 1100 (2012). Appellate courts exercise unlimited review when determining whether convictions are multiplicitous. *Weber*, 297 Kan. at 809.

In resolving a multiplicity claim, Kansas appellate courts first determine whether the convictions arose from the same conduct—whether the conduct is discrete or unitary. If the conduct is discrete, the convictions do not arise from the same offense and there is no double jeopardy violation. But if the conduct arose from the same act or transaction, appellate courts then determine whether that conduct constitutes one statutory offense or

26

two. *Sprung*, 294 Kan. at 306; *State v. Schoonover*, 281 Kan. 453, 496, 133 P.3d 48 (2006).

Under the first prong—whether a defendant's convictions arose from the same conduct—this court considers several factors, including whether: (1) the acts occurred at or near the same time, (2) the acts occurred at the same location, (3) a causal relationship existed between the acts, in particular whether an intervening event separated the acts, and (4) a fresh impulse motivated some of the conduct. *Sprung*, 294 Kan. at 307.

Under the second prong, appellate courts review the statutes to determine whether the same act or transaction involves conduct criminalized under more than one statute. "'[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact the other does not. [Citations omitted.]'" *Schoonover*, 281 Kan. at 466-67.

Here again, our analysis is highly fact intensive. Butler presents cases in which several acts arose from the same continuous transaction and the separate convictions for the acts were multiplicitous. See *State v. Colston*, 290 Kan. 952, 235 P.3d 1234 (2010); *State v. Potts*, 281 Kan. 863, 135 P.3d 1054 (2006); *State v. Dorsey*, 224 Kan. 152, 578 P.2d 261 (1978); *State v. Aguilera*, No. 103,575, 2011 WL 2555423 (Kan. App. 2011) (unpublished opinion). The State cites cases in which the opposite is true: Several acts were committed close in time and location but were different enough from each other to support multiple convictions. See *State v. Sellers*, 292 Kan. 346, 253 P.3d 20 (2011), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016); *State v. Richmond*, 250 Kan. 375, 827 P.2d 743 (1992); *State v. Zamora*, 247 Kan. 684, 803 P.2d 568 (1990); *State v. Howard*, 243 Kan. 699, 763 P.2d 607 (1988); *State v. Wood*, 235 Kan. 915, 686 P.2d 128 (1984). All these cases begin with the question of whether the sexual acts leading to the convictions were unitary or distinct.

As to the first factor of unitary conduct, the record reveals that Butler committed illegal sexual acts in the early hours of May 11, 2019. L.K.'s testimony places the events between a time well past midnight but before sunrise, likely between 4 a.m. and 6 a.m. As to the second factor, the record reveals that Butler committed the acts in two different bedrooms within L.K.'s house. As is often the case, however, the last two factors of the analysis are the more complex factors in determining unity of action. See *State v. Martin*, No. 107,602, 2013 WL 5422310, at *5 (Kan. App. 2013) (unpublished opinion). The third and fourth factors deal respectively with whether there were intervening events and a fresh impulse.

The order of events shows that Butler committed multiple crimes, not one continuous one. Butler does not argue that his conviction for rape as count 1 is multiplicitous with his conviction for aggravated criminal sodomy as count 2. Both parties acknowledge that they are two different crimes. Butler instead argues that his three rape convictions are multiplicitous with one another. And he argues that his two aggravated criminal sodomy convictions are multiplicitous with one another. But the order of Butler's crimes shows that they are not multiplicitous. Conduct is not unitary when sex acts are "separated from each other by other sexual acts." *Howard*, 243 Kan. at 703. Counts 1 and 3 are rape but count 2 is aggravated oral sodomy. That is, the first two acts of rape have the intervening act of aggravated sodomy in between. His act of digital rape would not merge with his act of forcing oral sex. See 243 Kan. at 703.

The crimes of rape and aggravated criminal sodomy do not have an identity of elements. See *Colston*, 290 Kan. at 972 (comparing elements of rape and aggravated indecent liberties with a child). Rape requires sexual intercourse, meaning penetration of the female sex organ. K.S.A. 2018 Supp. 21-5501(a); K.S.A. 2018 Supp. 21-5503. Aggravated criminal sodomy requires sodomy, meaning oral contact with or penetration of the genitalia, or anal penetration, or oral or anal copulation or sexual intercourse with

28

an animal. K.S.A. 2018 Supp. 21-5501(b); K.S.A. 2018 Supp. 21-5504. Rape must include penetration of the female sex organ and aggravated criminal sodomy must not.

After digitally raping L.K., Butler switched to forcing her to perform oral sex. The aggravated criminal sodomy act is an intervening event. See *Martin*, 2013 WL 5422310, at *7. From the oral sex, Butler switched to penile penetration of L.K.'s female sex organ. The oral sodomy does not merge with penile rape because they lack identity of elements. And the oral sodomy acts as the intervening event between the two rapes.

The same holds true for the penile rape, aggravated anal sodomy, and rape with the vibrator. After Butler raped L.K. with his penis and ejaculated, he held a vibrator to L.K.'s clitoris and inserted one of his fingers in her anus. After the anal sodomy, he penetrated L.K.'s vagina with the vibrator. Oral and anal sodomy are separate crimes and are not multiplicitous. *State v. McHenry*, No. 119,230, 2020 WL 2503484, at *14-15 (Kan. App. 2020) (unpublished opinion). And in any event, the two sodomies are separated by penile rape. The anal sodomy is an intervening event separating the rape by Butler's penis from the rape by vibrator. In this case, each new sex crime acts as an intervening event which distinguishes it from the previous crime. Because Butler's convictions are not multiplicitous, we affirm.

*Did the State commit reversible prosecutorial error during closing argument?*

Butler argues that the prosecutor's comments during closing argument inaccurately stated the evidence and were designed to inflame the passions of the jury. The State argues that the comments were within the wide latitude afforded to prosecutors or, alternatively, were harmless error not requiring reversal.

Appellate courts use a two-step process to evaluate claims of prosecutorial error: error and prejudice. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

"To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" *Sherman*, 305 Kan. at 109.

See also *State v. Fraire*, 312 Kan. 786, 791-92, 481 P.3d 129 (2021).

The statutory harmlessness test also applies to prosecutorial error, but when analyzing both constitutional and nonconstitutional error, appellate courts only need to address the higher standard of constitutional error. *Sherman*, 305 Kan. at 109.

Even if the prosecutor's actions are egregious, reversal of a criminal conviction is not an appropriate sanction if the actions are determined to satisfy the constitutional harmlessness test. *Sherman*, 305 Kan. at 114. Courts may still use prosecutorial misconduct as a descriptor for more serious occurrences. *State v. Chandler*, 307 Kan. 657, 695, 414 P.3d 713 (2018) (finding prosecutor's conduct to amount to prosecutorial misconduct in addition to prosecutorial error).

The *Sherman* decision, an opinion changing the law, acts prospectively and applies to all cases pending on direct review or not yet final. *State v. Lindemuth*, 312 Kan. 12, 16, 470 P.3d 1279 (2020).

It is improper for a prosecutor to comment on facts not in evidence, to divert the jury's attention from its role as fact-finder, or to make comments that serve no purpose other than to inflame the passions and prejudices of the jury. *State v. Watson*, 313 Kan. 170, 179, 484 P.3d 887 (2021); *State v. Stimec*, 297 Kan. 126, 128, 298 P.3d 354 (2013).

The extent of any ameliorating effect of a jury admonition attempting to remedy a prosecutor's error must be considered in determining whether the erroneous conduct prejudiced the jury and denied the defendant a fair trial. *State v. Barber*, 302 Kan. 367, 383, 353 P.3d 1108 (2015).

Appellate courts will review a prosecutorial error claim based on a prosecutor's comments made during voir dire, opening statement, or closing argument even without a timely objection, but the court may figure the presence or absence of an objection into its analysis of the alleged error. *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021).

Butler asserts that the State committed prosecutorial error when the prosecutor told the jury that he "took the vibrator and repeatedly slammed it into her vagina over and over and over again" and "raped her over and over and over again." He argues that these statements were factually incorrect and were designed to inflame the passions of the jury.

Butler is correct about the prosecutor's statement that he slammed the vibrator into L.K.'s vagina. The implication of the prosecutor's statement is error because (1) it misstates the evidence and (2) the statement seeks to inflame the passions of the jury. At trial, L.K. testified as follows:

> "And he took the vibrator and started putting it inside of me, inside my vagina. And he just (makes sound). It went on forever.
>
> . . . .

"I had plastic clear up to here. It was just horrible. I just kind of collapsed, like, oh, you know, making him think that, okay, wow, you know, I'm done, you know, whatever, please."

L.K. described a rape of extended duration. And her testimony of "plastic clear up to here" is suggestive and presumably was accompanied by a hand movement not included in the transcript. But the prosecutor's inference of repeated "slamming" extends or exaggerates L.K.'s testimony beyond what she actually said. See *Stimec*, 297 Kan. at 129 (finding that the prosecutor misstated the evidence by suggesting that the defendant "'stroked'" his son's penis with lotion when the evidence established that the defendant applied lotion but did not establish stroking). The prosecutor's statement that Butler "raped her over and over and over again" stayed within the bounds of the wide latitude afforded to prosecutors, and the expression followed the evidence of multiple illegal sexual acts. But the prosecutor's comment about Butler's use of the vibrator strayed beyond the evidence and reasonable inferences drawn from the evidence, with no other reason than to inflame the jury. See *State v. Majors*, 182 Kan. 644, 648, 323 P.2d 917 (1958) ("Although an attorney may indulge in impassioned bursts of oratory or may use picturesque language as long as he introduces no facts not disclosed by the evidence, he is bound to remember that he is an officer of the court, that his liberty of argument must not degenerate into license, and that he should always be decorous in his remarks to the extent that they do not impair administration of justice.").

But this error was harmless. This court considers the ameliorating effect of jury instructions and jury admonitions. *Barber*, 302 Kan. at 383. The trial court instructed the jury as follows: "Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence. If any statements are made that are not supported by evidence, they should be disregarded." The ameliorating effect of such an instruction may be small, but appellate courts presume that jurors follow the trial court's instructions. *State v. Peppers*, 294 Kan. 377, 392, 276 P.3d

32

148 (2012). The effect of the instruction may have been small, but the evidence was strong.

Viewing the evidence from the entire record, we find beyond a reasonable doubt that the error did not affect the jury's verdict. The physical evidence showed how Butler entered L.K.'s home. The State presented photographs of the door to the garage knocked off its hinges and the ADT security system cut off the wall with a knife. The neighbors testified about the frantic way in which L.K. rang their doorbell, knocked on the door, and asked for help. The State presented DNA evidence that the semen on the vaginal swab matched Butler's DNA sample. The police arrested Butler as he left L.K.'s home and they found Butler's underwear in L.K.'s bedroom. Considering the evidence, we conclude that the prosecutor's misstatement of fact would not have affected the jury's verdict.

*Did the trial court err by denying Butler's motion for a new trial based on ineffective assistance of counsel?*

Butler argues that the trial court erred in denying his motion for a new trial, based on ineffective assistance of counsel. The State contends that the trial court correctly denied the motion on its merits but would also have been correct to deny it simply for being untimely. Because the record conclusively shows that Butler was not entitled to relief, we affirm.

The only mechanism for considering an untimely motion for a new trial is to treat it as a collateral attack on the conviction—like a K.S.A. 60-1507 motion. *State v. Jarmon*, 308 Kan. 241, 250, 419 P.3d 591 (2018).

A trial court has three options when handling a K.S.A. 60-1507 motion:

"'(1) The court may determine that the motion, files, and case records conclusively show the prisoner is entitled to no relief and deny the motion summarily; (2) the court may determine from the motion, files, and records that a potentially substantial issue exists, in which case a preliminary hearing may be held. If the court then determines there is no substantial issue, the court may deny the motion; or (3) the court may determine from the motion, files, records, or preliminary hearing that a substantial issue is presented requiring a full hearing.' [Citations omitted.]" *State v. Adams*, 311 Kan. 569, 578, 465 P.3d 176 (2020).

The standard of review depends upon which of these options a trial court used. 311 Kan. at 578.

When the trial court summarily dismisses a K.S.A. 60-1507 motion, an appellate court conducts a de novo review to determine whether the motion, files, and records of the case conclusively establish that the movant is not entitled to relief. *Beauclair v. State*, 308 Kan. 284, 293, 419 P.3d 1180 (2018).

A movant bears the burden of establishing entitlement to an evidentiary hearing. To meet this burden, a movant's contentions must be more than conclusory, and either the movant must set forth an evidentiary basis to support those contentions or the basis must be evident from the record. *Thuko v. State*, 310 Kan. 74, 80, 444 P.3d 927 (2019). If this showing is made, the court must hold a hearing unless the motion is a second or successive motion seeking similar relief. *Sola-Morales v. State*, 300 Kan. 875, 881, 335 P.3d 1162 (2014); see also *Littlejohn v. State*, 310 Kan. 439, Syl., 447 P.3d 375 (2019) ("An inmate filing a second or successive motion under K.S.A. 60-1507 must show exceptional circumstances to avoid having the motion dismissed as an abuse of remedy."); *State v. Sprague*, 303 Kan. 418, 425, 362 P.3d 828 (2015) (applying initial pleading requirements when reviewing denial of posttrial, presentencing motion for ineffective assistance of counsel).

The extent of a movant's statutory right to be provided with effective assistance of counsel in a K.S.A. 60-1507 proceeding is a legal question to be reviewed de novo. *Mundy v. State*, 307 Kan. 280, 294, 408 P.3d 965 (2018).

Butler's appellate brief correctly states the procedure for handling an untimely motion for a new trial based on ineffective assistance of counsel. The motion is treated as a K.S.A. 60-1507 motion and the trial court must appoint counsel and hold a hearing unless the motion and the files and records of the case conclusively show that the movant is entitled to no relief. *Jarmon*, 308 Kan. at 250. If the trial court holds a hearing, the defendant has the right to conflict-free counsel. *State v. Sharkey*, 299 Kan. 87, 91, 98-99, 322 P.3d 325 (2014) (holding that it was reversible error for the trial court to allow the allegedly ineffective attorney to argue the ineffective assistance of counsel motion rather than appointing new, conflict-free counsel).

But Butler also argues that he did not validly waive counsel. This argument is peculiar, given his acknowledgment that he would not have a right to counsel if the record shows that he is not entitled to relief, as the trial court found. He may have included it in anticipation of the State's brief. He may have suspected that the State would argue that the trial court's error in not appointing counsel (if error at all) was harmless because Butler was proceeding pro se. But the State made no such argument. It simply asserted that Butler did waive his right to counsel without explaining why such waiver would matter. The motion, files, and record show that Butler is entitled to no relief. Thus, the trial court correctly denied his motion summarily, without appointing counsel, and his waiver of counsel is a nonissue which we need not address.

Butler's motion for a new trial contained two allegations of ineffective assistance of counsel. First, he asserted that "counsel's failure to cross-examine rape victim was ineffective assistance of counsel description of assailant had changed." Second, he compared his first trial and his second trial. His first trial ended in a mistrial when the

police officer called as a State's witness referenced his criminal history. Butler complains that counsel at his second trial did not move for a mistrial when two witnesses referenced his criminal history. Butler's appellate brief states: "[T]he record presents other substantial questions of fact about trial counsel's performance" and raises new challenges. But issues not raised before the trial court cannot be raised on appeal. See *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014). Butler's complaints about cross-examination and mistrial will not bear the weight he places on them.

The wording of Butler's claim seems to imply that his counsel did not cross-examine the victim. The record shows that this is not true. His counsel did cross-examine the victim. Butler's claim also is baseless if his argument is construed to mean that his counsel did cross-examine L.K. but did so poorly. Nevertheless, our Supreme Court has explained: "'It is within the province of a lawyer to decide what witnesses to call, whether and how to conduct cross-examination, and other strategic and tactical decisions.'" *State v. Butler*, 307 Kan. 831, 853-54, 416 P.3d 116 (2018) (quoting *Thompson v. State*, 293 Kan. 704, 716, 270 P.3d 1089 [2011]). From the language of the motion, Butler apparently believed that his counsel should have challenged L.K.'s description of her assailant as inconsistent. But the record shows L.K. consistently identifying her assailant, by name, as the man with whom she had been living with for months to her neighbors, to the police, and in testimony. Under the first prong of ineffective assistance of counsel, the record conclusively shows that counsel's performance was not deficient. Counsel had no reason to cross-examine L.K. on her description of her assailant.

Butler's other claim is fatally flawed because it is based on a misunderstanding of procedure. At his first trial, his counsel moved for, and the trial court granted, a mistrial after the State's witness referenced Butler's criminal history. Butler feels that his attorney should have done the same when two witnesses at his second trial mentioned his criminal history. But the first witness to mention Butler's previous incarceration was a defense

witness under cross-examination by the prosecutor. The second witness was a defense witness under direct examination by defense counsel. The trial court explained to Butler that these statements came from his own witnesses, they were made when they would not have made nearly the same impression on the jury, and that if his counsel had moved for mistrial, it would have been denied. The record does not support Butler's contention that his trial counsel's performance was deficient. Further, the trial court's statement that it would have denied a motion for mistrial demonstrates that Butler could not show prejudice from his counsel's failure to move for a mistrial. Thus, the record conclusively shows that Butler would not have been entitled to relief based on ineffective assistance of counsel.

*Did cumulative errors deprive Butler of a fair trial?*

Butler argues that the cumulative effect of prosecutorial and trial errors deprived him of a fair trial. Because the errors do not require reversal, we affirm Butler's convictions and sentences, except for aggravated kidnapping.

Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. *State v. Hirsh*, 310 Kan. 321, 345, 446 P.3d 472 (2019). In assessing the cumulative effect of errors during the trial, appellate courts examine the errors in the context of the entire record, considering how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence. 310 Kan. at 345-46.

If any of the errors being aggregated are constitutional in nature, their cumulative effect must be harmless beyond a reasonable doubt. *State v. Robinson*, 306 Kan. 1012, 1034, 399 P.3d 194 (2017).

37

When an appellate court finds no errors exist, the cumulative error doctrine cannot apply. *State v. Lemmie*, 311 Kan. 439, 455, 462 P.3d 161 (2020). A single error cannot support reversal under the cumulative error doctrine. *State v. Ballou*, 310 Kan. 591, 617, 448 P.3d 479 (2019); see also *Butler*, 307 Kan. at 868 (citing both no error and single error rules).

Butler argues that the State's "over-charging," prosecutorial error, and ineffective assistance of defense counsel deprived him of his right to a fair trial. He contends that the case was a credibility contest because the State had little physical evidence to support its case. Butler is correct only insofar as to Rissen's testimony and the photographic exhibits, which showed that L.K. did not sustain any significant neck injuries, either from choking or from a knife. Rissen also testified that she did not find any injuries when examining L.K.'s genitals. But that was not the State's only evidence. The State presented DNA evidence showing that the vaginal swab collected semen with DNA consistent with Butler. And the State's exhibits showing the door off its hinges and the ADT system cut off the wall would allow the jury to reasonably infer that L.K. did not invite Butler inside for consensual sex. The prosecutor's exaggeration of L.K.'s testimony during closing argument was harmless error. The other error, related to aggravated kidnapping, can be remedied by simply vacating that conviction. Remand is not necessary. Cumulative error does not provide Butler with relief because any errors identified here, even when combined, are harmless beyond a reasonable doubt given the evidence supporting Butler's convictions.

*Did the trial court violate Butler's jury trial rights when it sentenced him?*

For the first time on appeal, Butler argues that the trial court violated his Sixth and Fourteenth Amendment rights under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). He contends that the trial court violated these rights by

basing his sentence on his prior convictions without requiring the State to prove those convictions to a jury beyond a reasonable doubt.

But our Supreme Court has held that the use of criminal history to calculate the presumptive prison sentence under the revised Kansas Sentencing Guidelines Act (KSGA) does not violate due process under *Apprendi*. *State v. Sullivan*, 307 Kan. 697, 708, 414 P.3d 737 (2018) (reaffirming *State v. Ivory*, 273 Kan. 44, 41 P.3d 781 [2002]). Butler concedes that *Ivory* rejected the argument he makes here; nevertheless, he "includes it to preserve the issue for federal review."

We conclude that the trial court did not violate Butler's constitutional rights by using his prior convictions to calculate a criminal history score and determine his sentence under the KSGA. See *Sullivan*, 307 Kan. at 708. We are duty-bound to follow our Supreme Court's precedent unless there is some indication that the Supreme Court is departing from its previous position. *Rodriguez*, 305 Kan. at 1144. Because our Supreme Court has given no indication that it is departing from *Ivory*, and every indication that it considers *Ivory* good law, we affirm the trial court's calculation of Butler's criminal history score and its use in calculating Butler's sentence.

Affirmed in part, reversed in part, and vacated in part.